In re ROYAL YARN DYEING
CORP., Debtor.

PAUL RUTH TRADING CO., Plaintiff,

v.

ROYAL YARN DYEING CORP. and
Vander Dyeing & Finishing
Corp., Defendants.

Bankruptcy No. 182–11153–16 (CBD).
Adv. No. 185–0192.

United States Bankruptcy Court,
E.D. New York.

May 29, 1990.

Ballon, Stoll & Itzler by Will Levins, New York City, for Paul Ruth Trading Co.

Graubard, Mollen, Horowitz Pomeranz & Shapiro by Ellen Coin, New York City, for Royal Yarn Dyeing Corp. and Vander Dyeing & Finishing Corp.

Hesterberg & Keller by James F. McCoole, Brooklyn, N.Y., for intervenor Estate of Mae Marcus.

Rosenberg, Rosenberg & Koral by Richard Koral, Brooklyn, N.Y., for debtor.

Leopold, Gross, Sommers & Israel, P.C. by Bruce W. Sommers, Brooklyn, N.Y., for Creditors Committee.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

Disputes between landlords and tenants are not difficult to find in the bankruptcy court. Landlords are often angered by defaulting tenants who file petitions in bankruptcy either to stay a dispossess proceeding or in the hope of subleasing or assigning valuable properties to other entities at a profit. Nevertheless, the Bankruptcy Code condones such actions regardless of provisions to the contrary in leases in order to afford debtors the opportunity to avail themselves of such benefits in their efforts to reorganize.

## FACTS

On July 27, 1948, Royal Yarn Dyeing Corporation ("the Debtor" or "Royal Yarn") entered into a lease agreement between itself and a predecessor landlord, Paul Ruth Trading Corporation ("Paul Ruth" or "the plaintiff")[1] for the rental of

1. Subsequent to the submission of all post-trial memoranda, the Appellate Division of the State of New York, Second Department affirmed a lower court ruling finding that Paul Ruth is not the owner of record of the subject premises. After the true party in interest filed a motion to intervene in this proceeding, brought some time after all post-trial briefs were submitted, the

certain buildings located at 340 Morgan Avenue, Brooklyn, New York ("the premises"). Upon the expiration of the lease term, additional agreements were entered into between the parties from time to time on essentially the same terms.

The lease which is the subject of the instant proceeding ("the lease") was dated June 22, 1961. The rent agreed upon under the lease was approximately one dollar per square foot. This is considerably below the present fair market value of the premises. Its exact value in today's market is in dispute. It was extended several times, the last extension having been executed in 1977 ("The 1977 Agreement"). By its terms it ran until December 31, 1987 with two additional five year options to be exercised separately and independently, assuming the absence of a default by either party prior to the exercise date. Written notice of Royal's intention to exercise the first five year option was to be made by certified mail on or before January 1, 1987. This notice was not timely given.

All leases, modifications and extensions entered into between the parties specifically contemplated that the premises would be used in the debtor's business of dyeing, bleaching and finishing yarns as evidenced by the express provisions therein. These operations remain virtually the same as in 1948. It involves *inter alia*, multiple immersions of fabrics and yarns into vats of boiling water for hours at a time, and allowing water to overflow and drain into sewers at various points in the process. Inherent in the dyeing, bleaching and finishing process is the considerable use of water, steam, and chemicals which contribute to a condition of high humidity in the premises. This causes continual water damage to the building structure.

Prior to the time the Debtor took possession of the premises in 1948, the building had been used to manufacture cardboard folders. Many alterations were required before the building was suitable for the Debtor's primary business. These modifications were specifically denominated and

authorized by the 1948 lease in a provision entitled "alterations, additions and improvements." It included the installation of new water mains, trenches and sewers to carry away waste water from the dyeing machines, the installation of special wiring for greater electrical capacity, the construction of a boiler room and the addition of new boilers to heat the water required for the dyeing process, and the installation of new piping to carry the boiling water throughout the plant. The total cost of these alterations to the Debtor was estimated to be approximately $735,000. The renovations later included the construction of a new building on the premises adding approximately 25,000 square feet of interior space to the original 58,000 square feet. Royal Yarn also arranged for the conveyance by the City of New York of 30 feet of street for the Debtor's exclusive use to provide it ingress and egress to and from the premises.

Paul Ruth was hardly an absentee landlord. Its principal officers, Sam Miller and Mac Marcus, walked through and inspected the premises approximately every other month since the inception of the lease term in 1948. In fact, after Miller's death in the late 1970s, Marcus increased the frequency of the visits to once or twice a month.

Subsequent to the Debtor filing a petition for relief under Chapter 11 in 1982, it assumed the lease by stipulation with the landlord and the Debtor which was approved by Hon. Manuel J. Price, the bankruptcy judge who was then in charge of this case. It immediately sublet a portion of the premises to the other defendant in the instant adversary proceeding, Vander Dyeing & Finishing Corporation ("Vander") with the approval of the bankruptcy court. Subsequently the Debtor sought to sublet an additional portion of the premises to another company which Paul Ruth opposed on the ground that the master lease had terminated. This contributed to the institution of the within adversary proceeding. It is important to note that inasmuch as Royal Yarn was no longer active in its

parties have all agreed that the true owner will step into the shoes of Paul Ruth for purposes of

this decision which will be predicated upon the papers submitted.

main business, it was its intent to use the proceeds of the subleasing, now its sole source of income, to satisfy its rent, tax and water charge liabilities to the plaintiff under the lease, with the balance to be used to fund a plan of reorganization.

In December of 1984, Paul Ruth made the first written communication with Royal Yarn regarding a lack of repairs to the building. Michael Brownstein, Esq. of the law firm of Ballon, Stoll & Itzler, the attorneys for Paul Ruth, transmitted a letter to Debtor's counsel on the stationery of his firm. In the letter Mr. Brownstein declared "certain defaults," and demanded repairs or replacements of ten items, removal of two alleged violations, and a thorough cleaning of the premises. It should be noted that Mr. Brownstein appeared before this Court in this case on one occasion in 1983 at which time he moved for an order directing the Debtor to assume or reject the lease.

The landlord, unsatisfied with the condition of the premises and the tenant's alleged failure to cure a majority of the defaults, caused an inspection to be made in July of 1985 by Federated Consultant Service, Inc. ("Federated"), in the person of Charles A. Merritt, P.E.

The Federated report alleged serious deficiencies in the premises amounting to a failure by the Debtor to keep them in good repair. Royal Yarn challenged the report claiming several weaknesses. Approximately eight months after his first letter of December, 1984, in August of 1985 Mr. Brownstein wrote a second letter putting the Debtor on notice that if the alleged defaults were not corrected within 13 days, the lease would automatically come to an end.

The Debtor contends that it made a majority of the requested repairs upon receipt of the first Brownstein letter and had continued to make what it deemed to be the necessary repairs following receipt of the second letter. Within a week of receiving the second letter Royal Yarn by its Vice President Leonard Katz, responded directly to Mr. Brownstein refuting claims that repairs were not being attended to and ad-

vised him that repairs that had not been completed were contracted for and would be completed forthwith. Additionally, Mr. Katz reviewed each item set forth in the December letter and responded with the action taken. Finally, Mr. Katz stated that the Debtor would retain its own engineer to review the Federated report.

The defendants retained Ronald Ogur, a consulting and structural engineer whose practice focuses on industrial commercial buildings. He concluded that the items mentioned in the Federated report were of a cosmetic nature and were commensurate with the magnitude of normal maintenance required in a heavy duty industrial plant. Mr. Ogur found that the only item referred to in the Federated report affecting the structural integrity of the building was the deterioration of a concrete arch in the cellar.

The plaintiff subsequently commenced this adversary proceeding against Royal Yarn and Vander ("the defendants") seeking a finding that the lease was terminated as a result of Mr. Brownstein's notice of termination. In its complaint the plaintiff asserts that the defendants had allowed the premises to fall into a state of disrepair and accordingly seeks relief in the form of a declaratory judgment that the lease and Vander's sublease is terminated along with a judgment directing the defendants to vacate the premises.

The defendants countered with a joint answer raising several affirmative defenses including an argument that the condition of the premises is due to ordinary wear and tear over the fifty year permitted use of the premises as a dyehouse and the assertion that substantial amounts were spent every year in regular maintenance of the premises in accordance with the obligations under the lease ("first affirmative defense"). Also included is a defense that any attempt to terminate the lease was in violation of the automatic stay as provided by § 362 of the Bankruptcy Code ("second affirmative defense").

The defendants subsequently amended their answer with leave of the court to include two additional affirmative defenses,

to wit, that any defaults by the defendants for failure to make repairs were waived by the continuing conduct of the plaintiff and that the notice of termination upon which the instant proceeding is based was defective in that it was not executed by the landlord or by an appropriate agent. The amended answer also contained a counterclaim for an accounting of the interest received by plaintiff on Royal Yarn's security deposit and a turnover of same.

At a hearing held in connection with the adversary proceeding the undersigned designated Philip Rosenberg, a specialist in real estate matters, as an examiner under § 1104(b) of the Bankruptcy Code for the purpose of inspecting the subject premises and rendering a report setting forth the present condition of the premises and any recommended repairs to be performed by the tenants.[2] Mr. Rosenberg retained an engineer, Ralph J. Chiaro, to assist him in rendering his report.

After the trial was well under way, Paul Ruth brought on a motion seeking an order terminating all rights, title and interest that the defendants have or claim with respect to the premises and setting down an inquest hearing to determine the amount of fees and costs. The application was precipitated by an alleged collapse of a portion of the roof which went unattended for over two weeks. The defendants opposed the motion on the grounds that the collapse was repaired and the resulting damage was minimal. This Court denied the application without prejudice to include the allegations as part of the pending adversary proceeding.

The trial of the issues involved in these adversary proceedings consumed approximately 20 trial days spanning several months. Over 180 exhibits were admitted into evidence. During the course of the trial the undersigned visited the premises and personal observations were made regarding its condition.

## DISCUSSION

As noted above, the dispute before this Court arose as the result of an application the Debtor had made during the pendency of this Chapter 11 case for leave to sublet a portion of the premises other than that occupied by Vander. The Landlord objected to the relief sought on the ground that the Debtor had forfeited its main lease as hereinafter fully discussed. Inasmuch as the subject lease is virtually the sole asset of the Debtor, is necessary to an effective reorganization, and the issue before this Court concerns itself with the administration of the estate, particularly the Debtor's interest arising out of the lease, this Court finds it has jurisdiction to hear this matter under 28 U.S.C. § 157(b)(2)(A).

## TERMINATION OF LEASE

A lease is a contract containing provisions and clauses for the protection of both parties and terminates upon a definite date agreed upon by the parties. 74 N.Y. Jur.2d Landlord and Tenant § 3. It frequently contains provisions giving the parties, or one of them, the election, privilege or option to terminate the lease either at will or on the happening of some contingency, such as the destruction of the premises, or the decision of the landlord to sell, alter or improve the premises. These options granted by the provisions of a lease contract will be strictly construed where they are exercised in good faith. 74 N.Y.Jur.2d Landlord and Tenant § 763. Furthermore, in situations such as this, where a subtenant occupies the premises, under New York Law the valid termination of the prime lease will automatically terminate a sublease which is subject and subordinate to it. *In re Shoppers Paradise, Inc.*, 8 B.R. 271, 275 (Bankr.S.D.N.Y.1980).

Termination of a lease for a breach of covenants therein, however, is usually treated with some degree of leniency. Violations must be substantial in order to justify a forfeiture. Moreover, forfeiture will not be decreed where there has

---

**2.** The appointment was made prior to the date the U.S. Trustee program was effected in this District.

been substantial performance of the covenants of the lease and nominal injury to the landlord has resulted. Therefore, breaches must be substantial and material in order to cause the termination of a lease. 74 N.Y.Jur.2d Landlord and Tenant § 790. Paragraph 8(C) of the lease in question provides:

8(C). Throughout said term, the Tenant agrees, at its own cost and expense, to keep the building and the demised premises, (except those repairs which Landlord is obligated to make under the terms of this lease) fixtures and appurtenances, and all alterations, additions and improvements in good and substantial repair and clean condition; and will, at its own cost and expense, make all repairs, inside and outside, structural or otherwise, in and about the same necessary to preserve them in good order and condition, including the sidewalks and curbs adjacent thereto in good and substantial repair and free from dirt, snow, rubbish and any encumbrances whatsoever; and promptly to pay the expense of all such repairs....

The plaintiff contends that breach of this covenant to repair entitles it to relief accorded to them under paragraph 16 and 17 of the lease which provides:

16. If the Tenant shall default in the observance of any of the covenants and conditions of this lease ... then, and in any of such events (A) the Landlord may, without notice, re-enter the demised premises either by force or otherwise and dispossess the Tenant or other occupants thereof, and remove their effects and hold the premises as if this lease had not been made, and the Tenant hereby waives the service of the notice of intention to re-enter or of instituting legal proceedings to that end; and/or (B) the Landlord may give the Tenant three (3) days notice in writing, stating that the term of this lease shall expire by lapse of time upon the third day after such notice is given, and the Tenant shall vacate the demised premises affected by such notice or notices, and surrender the same to the Landlord....

17. Notwithstanding anything contained hereinabove, each of the parties hereto shall have a grace period of ten (10) days within which to perform and comply with the terms, covenants, conditions and agreements by each of said parties to be complied with and performed, including without limiting the generality of the foregoing, the payment of rent and additional rent by the Tenant.

■ The first step in an analysis of the issues herein is to determine what standards should be applied in determining whether the premises were kept in "good and substantial repair" as per paragraph 8(C) of the lease. The general rule in New York is that when a tenant covenants to keep the premises in "good order" or "good repair", and the covenant does not specifically indicate the quality and nature of the repairs to be made, then the extent of the obligation is limited by the age and class of the premises involved. In *Lehmaier v. Jones*, 100 A.D. 495, 91 N.Y.S. 687 (N.Y. App.Div.1905), the Appellate Division held that where a tenant has covenanted to "keep [the] premises in good repair ... the tenant is not obliged to keep the buildings up as new buildings, and the extent of the repairs he is obliged to make necessarily depend upon the age and class of the buildings." *See also Belgus Realty Corp. v. Irom*, 125 Misc. 870, 212 N.Y.S. 285 (N.Y. App.Term.1925).

■ In *Black & Yates, Inc. v. A.R. Fuels, Inc.*, 26 Misc.2d 627, 210 N.Y.S.2d 171 (Sup.Ct.1960), a landlord moved for summary judgment in an action for wilful destruction of realty and for breach of a lease. The lease in question concerned a pier and certain buildings attached thereto. The lessee was required to keep the property in "good order, condition and repair" and upon the expiration of the lease to surrender same "in good order and condition, reasonable wear and damage by the elements excepted." The Court held that "the issue of whether the premises were maintained and left in good order, condition and repair, must take into account not only the age of the property but the nature of it, namely, a pier and its appurtenances which

are constantly exposed to the elements and subjected to heavy blows." Similarly, in the instant case, this Court must take into account the understood use of the premises. The original 1948 lease, and every subsequent lease, expressly contemplated that the premises would be used for the purpose of dyeing, bleaching and finishing yarn. For that reason, even though they were referred to in the examiner's report, certain defects complained of by Paul Ruth must be discounted due to water damage that is inherent to the process involved.

Ronald Ogur, an expert witness who prepared a report for the defendants testified that with respect to upkeep and maintenance, the nature of industrial buildings such as these are quite different than commercial or residential buildings. In the former, minor repairs such as fixing broken windows and roof leaks are usually allowed to accumulate in order to prevent the need for glaziers and roofers to be constantly on call. The heavier the industrial use of the building, the less frequently repairs need to be made as permanent damage does not manifest itself very quickly. (Testimony of Ronald Ogur, January 11, 1988, pp. 81–82). Furthermore, Charles Merritt, an expert witness on behalf of the plaintiff, testified that several of the defects raised in his report had been substantially repaired, if not prior to the commencement of the adversary proceeding, then shortly thereafter. In light of the nature of the defendants' business and its effect on the structural integrity of the buildings as well as their age, this Court finds that the obligation to keep the premises in constant immaculate condition would place an undue burden on the tenant. This Court is cognizant of the fact that the premises were allowed to fall into a state of disrepair, but a good faith effort to rectify the situation has been substantiated by testimony of both parties.

The defendants assert that Paul Ruth has waived its rights to raise defaults under the covenant to repair due to its knowledge and indifference to the conditions which existed for a substantial period of time prior to the notice to cure. The general rule in New York is that a tenant's breach of a lease covenant may be waived by the acts of a landlord. In *In re Delta Motor Hotel of Syracuse, Inc.,* 10 B.R. 585 (Bankr.N.D.N.Y.1981), the landlord failed for three years to enforce its covenant with the tenant, requiring strict compliance with the lease and prompt payment of rent. The court held that the landlord was estopped to complain of a breach because of its passivity. *See also United States Trust Co. of New York v. Broadwest Realty Corp.,* 201 Misc. 769, 106 N.Y.S.2d 432 (Sup.Ct.1951) (Landlord waived its right of forfeiture by accepting rent from the tenant for several years and not acting upon a breach in the covenants).

In *A.D.W. Realty Corp. v. Dee–Dee Cafe Corp.,* 54 Misc.2d 130, 281 N.Y.S.2d 880 (N.Y.Civ.Ct.1967) the conditions that the landlord complained of had existed for over two years, during which time the landlord accepted rent. There, the court held that there was "no showing of a sudden or immediate urgency." Accordingly, the Court found that the landlord had waived its rights by failing for two years to give notice of its intention to terminate the lease for failure to remedy those conditions." *Id.* 281 N.Y.S.2d at 883.

As already noted, from the commencement of the leasehold in 1948 until 1979, the landlord and successor, represented by Sam Miller and Mac Marcus, visited and inspected the premises approximately every other month. After Mr. Miller's death in the late 1970s, Mr. Marcus increased the frequency of his visits to once or twice a month through the early 1980's when the notice to cure was sent. At no time did the landlord make a written demand to make any repair or bring any legal action against the Debtor or raise any defaults at the periodic renewals of the lease. Only on one occasion did the landlord ask the Debtor to remove the second story of one of the buildings due to a concrete floor which was caving in. This request was complied with and the landlord paid for a portion of the cost. (Testimony, Leonard Katz, September 11, 1987, pp. 114–21). In fact, the lease was assumed and Vander allowed to sublet a portion of the premises as per a stipula-

tion between the landlord and the Debtor with no complaints with respect to the condition of the premises by the landlord. Any defaults of the covenants in the lease would have been raised at that time inasmuch as a debtor may not assume a lease without first curing all defaults thereunder. 11 U.S.C. § 365(b)(1).

Expert witnesses on both sides testified that most of the conditions complained of do not develop overnight and would take upwards of ten years to manifest themselves. This would overlap with the period in which the landlord inspected the premises on a regular basis as well as the time at which the lease was assumed. The landlord should not be charged with the responsibility of identifying defects as an engineer would but the facts indicate that for years the landlord allowed the Debtor to operate in a less than pristine manner. In the absence of proven health violations and building code violations, it would be inequitable to require the Debtor to repair all the alleged defects at one time. In fact, the testimony shows that a good faith effort was made to complete a substantial portion of the repairs during the course of the lengthy trial. Although this by no means exculpates the Debtor, it shows that it intended to permanently cure the defaults and reach an agreed level of repair which it enjoyed with the landlord for so many years.

As an aside, the court appointed Examiner reached the same conclusion that in light of the plaintiff's passiveness over the years, the tenant should be allowed to remain in possession and be allowed to continue to sublet the premises. (See Supplementary Report of Philip Rosenberg dated July 24, 1987, pp. 1–3). Although this court gives little credence to the legal conclusions of a "layman", it is interesting to note that an independent examiner who is an expert in the field of real estate has a similar sense of equity.

The court is fully familiar with the rationale of In re Family Showtime Theatres, Inc., 67 B.R. 542 (Bankr.E.D.N.Y.1986), cited several times by the plaintiff. There, Judge Goetz properly opined that although courts abhor forfeitures, they must be cautious in using their equitable powers so as not to redraft contracts which are the result of arms-length transactions. She held that equity should not be applied to keep a tenant in possession where the tenant took no steps to cure certain breaches within the thirty day period following the serving of a notice of default. While this Court agrees with my learned colleague that tenants must adhere strictly to the terms of a lease in order to avoid its termination, the law of that case cannot be applied to the facts in the instant case. The good faith efforts of Royal Yarn to make repairs leads to the conclusion that it should be afforded a measure of leniency. Equity must be approached on a case-by-case analysis. In In re Sapolin Paints, Inc., 5 B.R. 412 (Bankr. E.D.N.Y.1980), Judge Goetz recognized that in certain circumstances the facts may mandate a different result. She noted that the bankruptcy court should not look with favor upon forfeiture clauses and they should be liberally construed in favor of a bankrupt lessee so as not to deprive the estate of property which may turn out to be a valuable asset. Sapolin Paints, supra, at 421 (citing Finn v. Meighan, 325 U.S. 300, 301, 65 S.Ct. 1147, 1149, 89 L.Ed. 1624 (1945)).

### NOTICE OF TERMINATION

The plaintiff's contention that the lease was terminated is based on the notice sent to Royal Yarn's attorney by Michael Z. Brownstein previously referred to. As was noted, the letter was written on the stationery of Mr. Brownstein's law firm and the only markings to identify the letter was the heading "Re: Marcus v. Royal Yarn Dyeing." The Debtor challenges the validity of the notice on the ground that the lease clearly stipulates that for the landlord to terminate the lease, notice must be given "by either of the parties hereto." The Debtor further asserts that since neither Mr. Brownstein nor his law firm were named in the lease and there is no authenticated proof that he was an agent of the landlord, Mr. Brownstein had no authority to bind the landlord.

The Court in *Siegel v. Kentucky Fried Chicken of Long Island, Inc.*, 108 A.D.2d 218, 488 N.Y.S.2d 744, 746 (N.Y.App.Div. 1985), ruled that:

A notice of termination signed by an agent or attorney who is not named in the lease as authorized to act for the landlord in such matters, and which is not authenticated or accompanied by proof of the latter's authority to bind the landlord in the giving of such notice, is legally insufficient to terminate the tenancy.

In *Siegel*, although the lease provided that either the landlord or its agents could exercise a forfeiture provision, the notice of termination was insufficient because the attorney who sent the notice was not named specifically in the lease nor was there any proof of authority annexed to the notice. *See also Lendon Realty Corp. v. Weber*, 193 Misc.120, 83 N.Y.S.2d 660 (Sup. Ct.1948).

In the instant case, the only identifying mark on the face of the letter tending to show it came from the landlord was the aforementioned introduction "Re: Marcus v. Royal Yarn Dyeing." It is not enough that Mr. Brownstein merely referred to himself as the landlord's attorney. This "extrajudicial declaration of agency is generally insufficient to bind the landlord and certainly is insufficient to create authority in the attorney if it does not exist." *Wertentiel v. Coe*, 132 Misc.2d 216, 503 N.Y. S.2d 692, 694 (N.Y.Civ.Ct.1986) (quoting *Reeder v. Sayre*, 70 N.Y. 180, 187–88 (N.Y. 1887)).

■ This Court agrees that the statement by Mr. Brownstein in his notice that he is the attorney for the landlord is inadequate to confer authority. It is hornbook law of agency that "the agent's" authority may not be proven out of the mouth of the agent." *Whitefriars East Co. v. Labyrinth Data Processing Enterprises Ltd.*, 132 Misc.2d 668, 504 N.Y.S.2d 1010, 1011 (N.Y.Civ.Ct.1986). *See also Granet Construction Corp. v. Longo*, 42 Misc.2d 798, 249 N.Y.S.2d 231 (N.Y.Sup.Ct.1964) (Attorney's notice held insufficient to terminate lease). Furthermore, "[t]he acts of a person assuming to be the representative of another are not competent to prove the agency in the absence of evidence tending to show the principal's knowledge of such act or assent to them." 2 N.Y.Jur.2d "Agency and Independent Contractors" Para. 26. Therefore, the statement of the signer of the notice that he is the attorney for the landlord is inadequate.

If the tenant had specific knowledge that Mr. Brownstein, or his law firm, were authorized as the landlord's agent to provide such a notice, the *Siegel* rule may not be applicable. *See Siegel*, 488 N.Y.S.2d at 746. Such knowledge may be imputed if the notice was signed by the same attorney who represented the landlord in court during a prior proceeding and refers to the prior proceeding and stipulation under which the tenant remained in possession. *437 Palisade Avenue Realty Corp. v. Boyd*, 118 Misc.2d 577, 461 N.Y.S.2d 943 (N.Y.Civ.Ct.1983).

The plaintiff contends that Royal Yarn was aware that Mr. Brownstein was authorized to act as the landlord's agent based on his prior appearance before this Court in which the Debtor was present. That appearance was at a hearing unrelated to any holdover proceeding and there is insufficient evidence that the Debtor should have known of Mr. Brownstein's authority. Moreover, the notice of termination did not refer to that hearing.

■ Courts will usually construe forfeiture provisions of leases under extreme scrutiny. *Siegel*, 488 N.Y.S.2d at 747. Notice is ineffective if served by an agent claiming to represent either party, who does not in fact have proper verification of his authority. *Lendon Realty, supra*, 83 N.Y.S.2d at 660; *747 So. Blvd. Realty Corp. v. Wein–Rose, Inc.*, 201 Misc. 552, 106 N.Y.S.2d 139, 141 (Mun.Ct.1951).

We view as meritless the claim that notice is effective because the tenant began making repairs after the notice was received. The tenant's actions will not be attributed to be in response to Mr. Brownstein's letter since this Court finds that repairs were being made prior to, as well

as after receipt of the notice of intended termination.

The debtor argues that the August, 1985 notice was violative of the automatic stay and therefore void and ineffective. Section 362(a)(3) of the Bankruptcy Code provides in pertinent part:

(a) ... [A] petition filed under ... this title ... operates as a stay, applicable to all entities of—

(3) any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate.

A leasehold or subleasehold constitutes property of the Debtor's estate. *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 429 (2nd Cir.1987). *See also In re The Hub of Military Circle, Inc.*, 13 B.R. 288 (Bankr.E.D.Va.1981) (The automatic stay pertains to leases). Any act taken to obtain possession of the property will be a violation of the automatic stay and such act will generally be deemed void and without effect. *In re Albany Partners Ltd.*, 749 F.2d 670 (11th Cir.1984); *48th Street Steakhouse, supra*, at 431. If the landlord in the present case were to terminate the lease, it would end the Debtor's interest in the leasehold, therefore violating the stay. *48th Street Steakhouse, supra*, at 431. Mere service of a notice to cure, however, should not constitute a termination of the leasehold.

The lease clearly sets forth the terms under which defaults are to be cured and the manner in which the leasehold could be terminated. Paragraph 17 of the lease provides for "a grace period of ten (10) days within which [the parties are] to perform and comply with the terms, covenants, conditions and agreements by each of said parties to be complied with and performed." If the tenant fails to comply with Paragraph 17, Paragraph 16 provides that "the landlord *may* give the Tenant three (3) days notice in writing, stating that the term of this lease shall expire by lapse of time upon the third day after such notice is given ..." (Emphasis added). As was noted in *Adirondack Ry. Corp.*, 28 B.R. 251 (Bankr.N.D.N.Y.1983), where a lease

had a similar clause that the landlord *may* terminate the lease, the court held that the provision is a condition subsequent rather than a conditional limitation and a violation of the lease does not render the contract void. Thus, the lease does not automatically expire until the lessor properly exercises its option within the confines of the agreement. *Adirondack*, 28 B.R. at 260.

The first notice to cure sent in this case placed the tenant on notice that it was in default of the lease agreement and was given a period to cure all defects to comply with the lease. The August, 1985 notice included additional requests to cure and further attempted to terminate the lease automatically upon expiration of a thirteen day period if the alleged defaults were not cured. As previously noted, the August, 1985 notice was sent eight months after Brownstein's first letter. This cannot be looked at as the two-step termination procedure under the lease which provides for a ten day grace period and a subsequent three day notice of termination. Therefore, the August, 1985 notice must be considered an initial notice which must be followed up by a separate and further three day notice in order to terminate the lease. Simply stated, termination could not have occurred under the procedure used.

Until such proper notice of termination is given, or until the Landlord takes any such action that would constitute a proper attempt to take the Debtor's property, the automatic stay could not have been violated. Informing the Debtor that is in default of a lease's covenants is not in violation of the stay. A landlord is entitled to protect its interests by putting a tenant on notice. It would be burdensome to a landlord to require that a motion to modify the automatic stay is needed simply to notify the tenant that certain problems exist. Therefore, the issue as to whether the alleged notice of termination violates the automatic stay need not be reached inasmuch as the notice given was inadequate.

Accordingly, we must find that notice was not properly given and the notice of termination was ineffective.

## OPTION TO RENEW

■ Under New York law, the untimely exercise of an option to renew a lease is looked upon with an eye towards equity in order to avoid the harsh effects of forfeiture. This was not always the case. Under early cases, it was held that equity could not relieve a tenant from the failure to perform conditions precedent. Thus, the failure to give timely notice of renewal precluded any equitable relief. *Fidelity & Columbia Trust Co. v. Levin,* 128 Misc. 838, 221 N.Y.S. 269 (N.Y.Sup.Ct.1927), *aff'd* 221 A.D. 786, 223 N.Y.S. 866 (N.Y.App.Div. 1927), *aff'd* 248 N.Y. 551, 162 N.E. 521 (N.Y.1928); *Doepfner v. Bowers,* 55 Misc. 561, 106 N.Y.S. 932 (N.Y.Sup.Ct.1907). Later courts took a much more liberal approach. The leading case reflecting such a view is *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.,* 42 N.Y.2d 392, 366 N.E.2d 1313, 397 N.Y.S.2d 958 (N.Y.1977) wherein the landlord sued to regain possession of the premises because the tenant failed to give timely notice to renew. The Court of Appeals held that the tardiness of the tenant's notice to renew due to inadvertence or negligence did not preclude the Court's granting of equitable relief to the tenant where the tenant's delay in exercising its option was the result of (1) excusable default, (2) the tenant had in good faith made valuable improvements of a substantial nature and (3) the landlord is not prejudiced by the tenant's delay in the giving of notice. *See also Sy Jack Realty Co. v. Pergament Syosset Corp.,* 27 N.Y.2d 449, 452, 267 N.E.2d 462, 318 N.Y.S.2d 720 (N.Y. 1971); *Pitkin Seafood Inc. v. Pitrock Realty Corp.,* 146 A.D.2d 618, 536 N.Y.S.2d 527 (N.Y.App.Div.1989); *Hunt v. Carlson,* 136 A.D.2d 853, 523 N.Y.S.2d 699 (N.Y. App.Div.1988); *Godnig v. Belmont Realty Co., Inc.,* 124 A.D.2d 701, 508 N.Y.S.2d 213 (N.Y.App.Div.1986); *Niagara Frontier Services, Inc. v. Thress,* 109 A.D.2d 1089, 487 N.Y.S.2d 228 (N.Y.App.Div.1985); *United Skates of America, Inc. v. Kaplan,* 96 A.D.2d 232, 468 N.Y.S.2d 642 (N.Y.App. Div.1983).

■ In the instant case, there is ample support on equitable grounds for protecting the Debtor from the forfeiture that would result if it were held to the letter of the lease agreement and the deadline for exercising the renewal option. The testimony taken before this Court and the record is replete with evidence that Royal Yarn has made substantial improvements to the premises over the life of its tenancy. It has provided evidence, unrebutted by the plaintiff, which shows that both before and after plaintiff's notice to cure, Royal Yarn expended substantial sums on such repairs and improvements. The record is replete with considerable evidence of substantial work on roofs, driveways, walls, the cellar, windows and elevators. There is also proof of the addition of new buildings, a sprinkler system, a new locker room and bathroom, the upgrading of electrical equipment, and the installation of new flooring.

The plaintiff contends that an overwhelming majority of these items represent repairs which the Debtor was contractually obligated to perform under the lease and, therefore, do not amount to improvements requiring the imposition of an equity standard. Black's Law Dictionary defines an "improvement" as an addition to real estate "amounting to more than mere repairs or replacement ... and is intended to enhance its value, beauty or utility. [It includes] any permanent structure or other development [or] expenditure to extend the useful life of an asset ..." Black's Law Dictionary 682 (5th ed. 1979). Without the need for an item by item analysis of improvement vs. repair, there are enough items such as the installation of upgraded electrical equipment and new flooring with increased weight tolerance to signify the addition of new value to the premises.

Assuming, *arguendo,* that the improvements were amortized over the length of the lease so that the benefits of the improvements were fully enjoyed by the Debtor, as argued by the plaintiff, there are cases in which a forfeiture is prevented without a showing of substantial improvements. In *The Siesel Co., Inc. v. Steve Werner, Inc.,* 109 Misc.2d 653, 440 N.Y. S.2d 530 (N.Y.Civ.Ct.1981), the tenant's investment in the premises was limited to a telephone system and it was still allowed to

exercise its option late on the grounds that the court viewed the tenant to have been threatened by sufficient hardship to warrant protection by equity simply because of the high cost of relocating. The court held that "[e]scalating commercial rental rates in Manhattan make almost any leasehold commencing in 1977, valuable in 1980.... It is the view of this Court that the cost of relocating created by rising rents creates a forfeiture *even in the absence of substantial improvement.*" (Emphasis added). *Siesel,* 440 N.Y.S.2d at 532. Similarly, because of the special equipment and structural capacity needed for the business of dyeing and finishing yarns, the costs for Vander to relocate to other facilities would be exorbitant. *See also Grunberg v. George Assoc.,* 104 A.D.2d 745, 480 N.Y.S.2d 217 (N.Y.App.Div.1984). This fact distinguishes the defendant's position from the other cases in which many similar facilities existed elsewhere thereby allowing relocation without significant hardship. *Soho Development Corp. v. Dean & DeLuca, Inc.,* 131 A.D.2d 385, 517 N.Y.S.2d 498 (N.Y.App.Div.1987).

■ The instant lease, as extended, would run into 1997 at the rate of approximately $1.00 per square foot. The evidence indicates that the market rate in 1987 was $4.00–4.50 per square foot. Therefore, the lease is clearly a valuable asset. Plaintiff's reasoning that there is no meaningful forfeiture due to the ceasing of the Debtor's operations is unfounded because the creditors of Royal Yarn are entitled to reap the benefits of the Debtor's assets by whatever means maximizes their value. The landlord has suffered no prejudice as a result of the late exercise of the option. There is no evidence that the landlord has changed its position because of the Debtor's failure to timely exercise the option and the fact that the landlord would be able to realize a higher rate in re-renting the premises does not amount to prejudice. *Nanuet National Bank v. Saramo Holding Co.,* 153 A.D.2d 927, 545 N.Y.S.2d 734 (N.Y.App.Div.1989), *appeal den'd* 75 N.Y.2d 705, 552 N.Y.S.2d 927, 552 N.E.2d 175 (N.Y.1990).

The Court is mindful that the landlord was aware of the assumption and assignment of a portion of the premises to Vander and equitable consideration must be given where communications between the landlord and Royal Yarn concerning the assignment to Vander and various repairs and improvements bear out that the plaintiff landlord knew or should have known that Royal Yarn intended to renew the lease.

Paul Ruth incorrectly argues that the Debtor's decision to exercise the option was an afterthought and that the Debtor expected to vacate the premises in 1987. To support its proposition, the plaintiff points to a discussion between the Court and the attorney for the Debtor wherein the Court asks counsel how long the Debtor intends to be at the premises. The attorney for the Debtor responds, "They are going to remain there until the expiration of this lease." (Hearing of January 15, 1986, p. 7). Paul Ruth interprets this statement to mean that the Debtor did not intend to exercise the option. It is more plausible, however, that the response was a statement of defiance that the Debtor had no intention of leaving the premises until the last possible moment. This would contemplate the utilization of any and all terms in the lease which would allow the Debtor to remain in possession.

## SECURITY INTEREST

Royal Yarn sets forth a counterclaim stating it is entitled to any and all interest accrued from a $20,000 deposit plus an accounting the landlord holds as security pursuant to the June 22, 1961 lease. Under the New York General Obligations Law Sections 7–103(2) and (3) state in pertinent part:

... If the person depositing such security money in a banking organization shall deposit same in an interest bearing account, he shall be entitled to receive, as administration expenses, a sum equivalent to one per cent per annum upon the security money so deposited, which shall be in lieu of all other administrative and custodial expenses. The balance of the

interest paid by the banking organization shall be the money of the person making the deposit or advance and shall be either held in trust by the person with whom such deposit or advance shall be made, until repaid or applied for the use or rental of the leased premises, or annually paid to the person making the deposit of security money.

Any provision of such a contract or agreement whereby a person who so deposits or advances money waives any provision of this section is absolutely void.

N.Y.Gen.Oblig.Law § 7–103 (McKinney 1990). Therefore, "the landlord is under no duty to place the funds in an interest-bearing account, but, if the security is in fact invested in an interest-bearing account," the interest paid by the banking organization shall be paid to the person making the deposit of security money as provided in the lease. *Stuarco, Inc. v. Slafbro Realty Corp.*, 30 A.D.2d 80, 289 N.Y.S.2d 883, 886.

Paragraph 23 of the lease provides:

23. The Tenant has on deposit with the Landlord the sum of Twenty Thousand ($20,000) dollars, the receipt whereof is hereby acknowledged by the Landlord as security for the full and faithful performance by it of all the terms, covenants, conditions and provisions of this lease upon its part to be performed. Landlord agrees to continue to maintain the deposit of said sum of $20,000.00 in four (4) separate federal savings and loan association accounts, in its name, and the *interest on said accounts shall be withdrawn by the Landlord, semi-annually, hereafter, and the amounts thereof forthwith paid over to the Tenant.* The Landlord shall return said sum of $20,000.00 to the Tenant after and within fifteen (15) days from the time fixed as the expiration of the term pursuant to the provisions of this lease, providing Tenant shall have fully and faithfully carried out and performed all of the terms, covenants, conditions and provisions on its part to be performed hereunder. The security deposited under this lease shall not be mortgaged, assigned, pledged, hypothecated or encumbered by the Tenant without the written consent of the Landlord first obtained, which consent shall not be unreasonably withheld. (Emphasis added).

Interpretation of a lease "should be determined from the language employed, and where the language is clear and unambiguous, interpretation is a matter of law to be determined solely by the court." *Louis R. Morandi, P.C. v. Charter Management Co.*, 553 N.Y.S.2d 663 (N.Y.App.Div.1990) (quoting *Cale Development Co., Inc. v. Conciliation and Appeals Board*, 94 A.D.2d 229, 234, 463 N.Y.S.2d 814 (N.Y. App.Div.1983), *aff'd* 61 N.Y.2d 976, 463 N.E.2d 619, 475 N.Y.S.2d 278 (N.Y.1984). In such circumstances resort cannot be had to extrinsic evidence to contradict the express terms of the writing.

The lease provision is clear where it provides that "interest on said accounts shall be withdrawn by the Landlord, semi-annually ... [and] paid over to the tenant." Such semi-annual payment is not contingent on debtor fulfilling its obligations under the lease. Plaintiff's argument that Debtor is entitled to interest on the security deposit only if it is not in default of the lease is unfounded. The landlord may be entitled to the security deposit specified in the lease, but not to any increase due to the accumulation of the earned interest. *Stuarco, Inc. v. Slafbro Realty Corp.*, 30 A.D.2d 80, 289 N.Y.S.2d 883, 886 (N.Y.App. Div.1968). Therefore, if said security is to be reduced by any damages it may have sustained, and provided for in the lease, it is the principal of the security deposit and not any interest accrued therefrom, that may be retained by the landlord. Upon the application of Royal Yarn, this Court will hold an inquest to determine the amounts owed under the lease provision in as much as an exact accounting has not been rendered.

## CONCLUSION

Based on the foregoing, judgment is rendered in favor of the defendants, the complaint is dismissed and a hearing will be set at a mutually agreeable time to determine

the interest on the security deposit to be awarded to the Debtor.

Submit proposed judgment in accordance with this decision.