**In re CALDOR, INC.–NY, The Caldor Corporation, Caldor, Inc.–CT, et al., Debtors.**

**CALDOR, INC.–NY, Plaintiff,**

**v.**

**NEWBURGH MALL LTD. PARTNERSHIP, Defendant.**

**Bankruptcy No. 95 B 44080. Adv. No. 96 8798A.**

United States Bankruptcy Court, S.D. New York.

Feb. 4, 1997.

Camhy Karlinsky & Stein LLP, New York City (John F. Triggs, of counsel), for Plaintiff.

Silberman & DiFilippo, A Professional Corporation, Bala Cynwyd, PA (Michael S. Silberman, of counsel), for Defendant.

## DECISION AFTER TRIAL

JEFFRY H. GALLET, Bankruptcy Judge.

### THE PROCEEDING

Caldor, Inc.–NY ("Caldor"), sues its landlord, Newburgh Mall Ltd. Partnership ("Newburgh"), to determine their respective

obligations in connection with a store roof. It specifically prays for an order requiring Newburgh to repair the roof, declaring that it has no obligation to repair the roof and awarding it monetary damages of $33,515.00, costs and legal fees.

Newburgh counterclaims for an order declaring that if the roof requires replacement, the replacement is Caldor's responsibility and that Caldor is required to surrender the store, at the end of its lease, in "good condition and repair."

The proceeding was tried before me without a jury.

## FINDINGS OF FACT

Newburgh, the successor in interest to The Fairfield Mall Limited Partnership ("Fairfield"), is the owner of a single level, 390,000 square foot, enclosed, 55 store, regional shopping mall in Newburgh, New York, known as the "Newburgh Mall." Caldor is a well-known chain of retail department stores.

In November of 1978, Fairfield and Caldor entered into a lease ("The Lease") for an 84,000 square foot, one-story building ("The Store"). The Lease is not a form lease. Rather, it is the product of a negotiation between sophisticated business people.

Article 12 of The Lease provides, in pertinent part:

> 12.01 Except as otherwise expressly provided in 12.02 hereof, throughout the term hereof Tenant will, at its cost and expense, take good care of the Demised Premises ... and keep the same in good order and condition and promptly, at Tenant's own cost and expense, make all repairs, alterations and replacements necessary to maintain such good order and condition ...
>
> 12.02 Anything to the contrary herein contained notwithstanding, unless the need for the same arises by reason of the acts or omissions of the Tenant ..., Landlord shall have the following repair responsibilities:
>
> B. Provided prompt written notice shall be given by Tenant to Landlord promptly following Tenant's discovery of the necessity for the repairs hereinafter set forth:

> (1) Landlord shall make all repairs to the roof ...

Article 27 requires Caldor to return the store to Newburgh in good condition, "reasonable wear and tear excepted."

Section 23.04 requires Caldor to send any default notice to mortgagees of record, as well as, to Newburgh. It states that a default notice by Caldor to Newburgh will not be "legally effective" unless sent to the mortgagee. Article 30 of the lease requires notice to Newburgh to be sent to its home office in Pennsylvania. Notice was never sent to the mortgagee nor was notice given to Newburgh's home office before Caldor's letter of December, 1995.

Construction of The Store was completed in 1980 and Caldor took occupancy. In October of 1984, the roof began to leak.

At Caldor's request, Hayden Roofing Co., Inc. ("Hayden") inspected the roof and, on November 9, 1984, wrote Caldor with recommendations to remedy the problem. One recommendation was to coat the roof. Hayden advised that in order to keep the roof in good condition, it would be necessary to re-coat it every "4 to 6 years." Caldor forwarded the letter to Anthony Alberigi, Newburgh's on site mall manager.

Newburgh hired Hayden to do its recommended repair work, but, by a May 13, 1985 letter to Caldor, declined to authorize Hayden to coat the roof. The letter gave no indication of Newburgh's position on who was responsible for coating. The roof leaked again during the period from 1989 through 1995. By letter dated February 3, 1993, Hayden again advised Caldor that a roof coating was recommended.

It is clear that each of these sophisticated business entities was fully aware of the need to coat the roof so that it would function appropriately. Neither entity did the work or brought the matter to a head by demanding that the other do it. Rather, they simply let the elements do their damage.

Caldor concedes that it never coated the roof and that lack of coating is a significant causal factor in the roof's present condition. Caldor notified various mall managers[1] of

---

1. There were at least six mall managers since 1980.

the roof problem, but did not send a notice to Newburgh's home office as required by The Lease. However, various roof repairs were made over that period, including a $29,000 job in 1995. The parties shared the cost, apparently in accordance with Article 12 of The Lease.

From at least 1993 on, Caldor did inspections of the store, including visual inspections of the roof. The inspections did not reveal debris in the roof drains.

In December of 1995, the problem worsened and the store experienced significant water leaks. On December 7, 1995, Michael Martini, a Caldor executive, telephoned Leonard B. Shore, a member of the Newburgh partnership and Senior Vice President of the Rubin Organization, which manages the Newburgh Mall, concerning the leaks. He subsequently sent Mr. Shore written information on the subject and on February 1, 1996, a written demand for remedial action by Newburgh.

Newburgh estimates, and Caldor does not dispute, that the roof needs to be replaced at a cost exceeding $400,000, because any other less costly repair is likely to be a short term solution, at best. No evidence was presented as to the expected usable life of a 16–year–old roof of this type that had been appropriately and timely coated, the adequacy of the original roof installation and/or the repairs made by the landlord, or any apportionment of the responsibility for replacing the roof between the parties. Accordingly, I make no finding on those issues.

## DISCUSSION

### Lease Interpretation

Section 26.01 D of The Lease provides that it will be interpreted under the laws of the State of New York. I have done so. However, New York law does not clearly address all of the issues before me.

Under New York law, ordinary contract rules of construction apply to leases. *George Backer Management Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978). The plain language of a lease controls its interpretation. The ordinary meaning of the words will be used unless there is a showing that they were used in a different sense or that they have established legal or technical definitions. NY Jur 2d, Landlord and Tenant 66; *Schreiber v. Dick Voight Buick, Inc.,* 103 A.D.2d 1025, 478 N.Y.S.2d 413 (4th Dept. 1984).

Caldor cites Justice Herbert Posner in *Anzalone v. Normant Drugs, Inc.,* 136 Misc.2d 995, 519 N.Y.S.2d 601 (Sup.Ct. Queens Cty.1987), quoting the Appellate Division, Fourth Department in *Reltron Corp. v. Voxakis Enterprises, Inc.,* 57 A.D.2d 134, 139, 395 N.Y.S.2d 276 (4th Dept.1977), for the principle that a lease "should be interpreted as a whole" and "construed so as to carry out the parties' intent, gathered if possible from the language of the lease ... or as it is sometimes put 'from the four corners of the instrument.'" *Anzalone* at 996, 519 N.Y.S.2d 601. That is, indeed, the law in New York.

### Responsibility for Coating the Roof

Article 12 of The Lease, as set forth above, defines the responsibilities of Caldor and Newburgh with regard to repairs and maintenance.

At common law, a covenant to "maintain" is a covenant to repair. However, the implied common-law obligations to repair are superseded by express repair covenants. *See* FRIEDMAN ON LEASES § 10.301 at 620 (1978). Additionally,

[i]n the absence of a covenant to the contrary the lessor is under no obligation to repair the demised premises. A lessee assumes all the risks arising from the condition of the premises unless there is an express agreement on the part of the lessor in relation thereto, and, an express covenant will not be enlarged by construction. Nor will a covenant to repair be implied.

*Edwards v. Ollen Restaurant Corp.,* 198 Misc. 853, 98 N.Y.S.2d 815, 819 (Mun.Ct. 1950) *aff'd,* 198 Misc. 858, 103 N.Y.S.2d 512 (A.T. 2nd Dept.1950).

[The] landlord's obligation to repair, if any, rests upon and is to be determined from the language of the lease. Such language is deemed to express the intention of the parties. If there be ambiguity, such ambi-

guity may be resolved by a consideration of such surrounding circumstances as were presumably considered by the parties at the time of the execution of the lease. *Rapid Electric Co., Inc. v. Rowe Holding Corp.,* 47 A.D.2d 615, 616, 364 N.Y.S.2d 523, 524 (1st Dept.1975).

The terms of Article 12 of The Lease are clear. Repairs to the roof were Newburgh's responsibility. That responsibility was specifically carved out of the general maintenance and repair section of Article 12.01, which placed upon Caldor the responsibility for taking good care of the demised premises, including making all repairs, alterations and replacements which are necessary to maintain the demised premises in good order and condition. "Where, as in this case, the parties in clear and unequivocal language, defined the duty to repair, there is no room left for construction." Id. at 821; *Mirsky v. Seaich Realty Co.,* 256 A.D. 658, 11 N.Y.S.2d 191 (1st Dept.1939). Therefore, as an initial determination, I find that the responsibility to repair the roof rested with Newburgh.

█ Although the parties devote a good portion of their briefs to the issue of who had the responsibility of repairs, the real issue before me is whether coating the roof falls under the definition of a "repair" for which Newburgh was responsible, or "maintenance," for which Caldor was responsible. Since The Lease did not define what constituted a repair and what constituted a maintenance item, I must answer that question.

█ Newburgh has the burden to show that a particular item is an exception to its covenant to repair. *Edwards v. Ollen Restaurant Corp.,* 98 N.Y.S.2d at 821; *Taylor v. Campbell,* 123 A.D. 698, 108 N.Y.S. 399 (2nd Dept.1908).

Black's Law Dictionary defines the word "Maintain" as:

[A]cts of repairs and other acts to prevent a decline, lapse or cessation from existing state or condition; bear the expense of; carry on; commence; continue; furnish means for subsistence or existence of; hold; hold or keep in an existing state or condition; hold or preserve in any particu-

lar state or condition; keep from change; keep from falling, declining or ceasing; keep in existence or continuance; keep in force; keep in good order; keep in proper condition; keep in repair; keep up; preserve; preserve from lapse, decline, failure, or cessation; provide for; rebuild; repair; replace; supply with means of support; supply with what is needed; support; sustain; uphold.

"Repair" is defined as:

To mend, remedy, restore, renovate. To restore to a sound state after decay, injury, dilapidation or partial destruction. The word "repair" contemplates an existing structure or thing which has become imperfect, and means to supply in the original existing structure that which is lost or destroyed, and thereby restore it to the condition in which it originally existed as near as may be.

BLACK'S LAW DICTIONARY 953, 1298 (6th ed. 1990).

In addition, The Random House Dictionary of the English Language defines "maintain" as:

To keep in existence or continuance, preserve, retain; to keep in due condition, operation or force, keep unimpaired.

"Repair" is defined as:

To restore to a good or sound condition after decay or damage; mend; to restore or renew by any process of making good, strengthening etc.

THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 865, 1215 (1967).

Although the definition of "maintain" encompass acts of repair, the two acts are significantly different.[2] To maintain means to keep the status quo. It is Caldor's responsibility to keep the roof, to the extent reasonable, in the state in which it found it. This would imply that Caldor would be responsible for any damage to property caused by its failure to maintain it.

On the other hand, to repair implies that a certain item has reached a state where it has been damaged and needs to be returned to

2. By dividing their respective responsibilities into the duty to repair and the duty to maintain, the parties appear to have also come to that conclusion.

its original condition, or at least be returned to an undamaged state.

Whether coating a roof is maintenance or a repair is not answered by existing case law. In support of its position that coating was a maintenance item, Newburgh relies on Hayden's November 9, 1984–letter which states:

To properly maintain any smooth surface roof system, it is generally accepted practice to coat the roof with an approved roof coating every 4 to 6 years. This will insure getting maximum life out of the finishing felt. Since the roof on this building falls into this category, we recommend that you coat this roof with new fibrated aluminum roof coating, installed at a rate of approximately 1–1.5 gallons per 100 square feet.

However, Hayden's characterization is not dispositive of the issue.

In *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2d Cir.1985), a case dealing with an antitrust issue, the Second Circuit made findings of fact regarding the coating process. It stated:

Defective roofs are generally repaired by removing and replacing the entire roof. A less common method of restoration, accounting for less than 10% of sales of roof repair products, is the application of various resaturant coatings.... Because the use of this coating pales by comparison to the conventional "remove and repair" method....

Although I am not bound by the Second Circuit's findings of fact, I am persuaded by its characterization of the coating process. The Second Circuit's statement is the only case on the issue. By referring to the coating process as a "method of restoration" places it within both the Black's and the Random House definitions of "repair." That line of reasoning places the responsibility to coat the roof on Newburgh. It is Newburgh's burden to show that this particular repair was outside its express covenant to repair the roof. *Edwards v. Ollen Restaurant Corp.*, 98 N.Y.S.2d at 821. It has failed to do so.

■ There is additional support for this conclusion. It appears to me that Newburgh

has waived its right to now declare that Caldor breached the agreement to maintain the roof. Since Hayden's November, 1985–letter, the issue of who had the responsibility to coat the roof was ignored by both parties. Although, at the time, it appears that each party believed it was the other's contractual responsibility to coat the roof, neither made a demand for compliance.

As time progressed, and the roof deteriorated, Newburgh continued to make repairs to the roof, aware that Caldor had not coated it.

Article 12.02 of The Lease only requires Newburgh to make repairs to the roof in circumstances where the repairs are not necessitated by "acts or omissions of the Tenant, its officers, employees, agents, licensees or contractors ..." If Newburgh believed that the damage to the roof was the result of Caldor's failure to coat the roof and, despite that belief, made repairs, knowing that the roof was never coated, then Newburgh has either waived the argument that Caldor breached The Lease or made an admission that Caldor's failure to coat is not the cause of the damage.

■ In New York, a tenant's breach of a lease covenant may be waived by the acts of a landlord. *In re Royal Yarn Dyeing Corp.*, 114 B.R. 852, 858 (Bankr.E.D.N.Y. 1990). In fact, during the entire time that Newburgh claims Caldor was in breach of The Lease,[3] it continued to accept rental payments from Caldor.

When rent is accepted with knowledge of a particular conduct which is claimed to be a default, the acceptance of such rent constitutes a waiver by the landlord of the default. The acceptance of the rent is in effect an election by the landlord to continue the relationship of landlord and tenant.

*Atkin's Waste Materials, Inc. v. May*, 34 N.Y.2d 422, 314 N.E.2d 871, 358 N.Y.S.2d 129 (1974).

For more than ten years, Newburgh accepted rent from Caldor with knowledge that the roof was never coated. If Newburgh truly believed that Caldor was in breach of

**3.** At this time I am not making a ruling as to whether Caldor was in breach of The Lease. A

determination of that issue is not relevant for purposes of this decision.

The Lease, it had ample time to notify Caldor of that breach, as required by The Lease.

**Waiver of the Written Notice Provision**

 Newburgh argues, alternatively, that Caldor's failure to give "prompt written notice" of the need for repairs extinguished Newburgh's obligation to repair the roof. Caldor, on the other hand, argues that Newburgh has waived the written notice provision. I must, therefore, determine whether Newburgh has waived the written notice requirements of sections 12.02(B) and 31.01 of The Lease. Section 12.02(B) of The Lease provides that Caldor is required to give written notice to Newburgh following Caldor's discovery of the necessity for repairs to the roof. Section 30.01 designates which parties are to be given written notice.

 Any party to a contract may waive a provision of that contract. NY Jur 2d Contracts § 330. Under New York law, a waiver is the voluntary abandonment or relinquishment of a known right under the lease. *Jefpaul Garage Corp. v. Presbyterian Hospital in City of New York,* 61 N.Y.2d 442, 474 N.Y.S.2d 458, 462 N.E.2d 1176 (1984); *Monarch Information Services, Inc. v. 161 William Associates,* 103 A.D.2d 703, 477 N.Y.S.2d 650 (1st Dept.1984).

> It is essentially a matter of intention. Negligence, oversight, or thoughtlessness does not create it. The intention to relinquish the right or advantage must be proved. Occasionally it is proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary. Then the waiver is established as matter of law. Commonly, it is sought to be proved by various species of proofs and evidence, by declarations, by acts, and by nonfeasance, permitting differing inferences and which do not directly, unmistakably or unequivocally establish it.... The evidence must have probative force sufficient to prove that there was in fact an intention to waive the right or benefit—a voluntary choice not to claim it. The acts and language of the party must be given, as evidence, their natural and logical effect under the circumstances of the case.

*Alsens American Portland Cement Works v. Degnon Contracting Co.,* 222 N.Y. 34, 37, 118 N.E. 210 (1917). Additionally, "the giving of a written notice ... was a mere condition precedent to the right of a recovery for damages in a case of a violation by the landlord of his covenant to repair, and as such it could be waived by the landlord or his duly appointed agent." *Graber v. Bergman,* 85 Misc. 447, 147 N.Y.S. 945 (1st Dept.1914).

In support of its argument that Newburgh waived the written notice requirements, Caldor argues that Newburgh, through its various mall managers and on site management company, was fully aware of the needed repairs, and responded to those needs, without the benefit of the written notice required by The Lease.

In 1984, when the roof began to leak, Caldor contacted Hayden to inspect the roof. After Caldor received Hayden's recommendations, it forwarded the letter to Newburgh's on site manager. Thereafter, Newburgh hired Hayden to perform some of the work it recommended. Newburgh did not note that Caldor did not comply with the lease requirement as to notice.

From 1989 through 1995, the roof experienced numerous leaks. Although Caldor did not notify Newburgh of these leaks as required by The Lease, it did notify Newburgh's various mall managers. Over that period of time, repairs were made to the roof, including a $29,000 repair job in 1995. The cost of that job, as well as other smaller jobs, was shared by Newburgh and Caldor, pursuant to Article 12 of The Lease.[4]

 Newburgh, on the other hand, argues that it never intended to waive the written notice requirement. It argues that there is not a single statement, written or oral, evidencing its intention to waive. This is true. Newburgh, however, fails to recognize the fact that a party's actions can indicate an intent to waive. *Alsens American Portland Cement Works v. Degnon Contracting Co.,* 222 N.Y. 34, 37, 118 N.E. 210 (1917).

---

**4.** Article 12(B)(1) of The Lease provided that during the first ten years of The Lease, Newburgh would be responsible for all costs for repairs to the roof that exceeded $2,500 and during the remainder of the initial term all costs that exceeded $5,000.

For a period of almost eleven years, Newburgh, through its agents, various on site managers and its management company, was aware of the repair problems with the roof. It responded to the problems by making repairs. Indeed, Newburgh expended a considerable sum of money as a result of notices to its site managers. Newburgh never indicated to Caldor that it was in breach of The Lease for failing to notify Newburgh of the needed repairs as required by Article 12 of The Lease. It can be reasonably interpreted that Newburgh's actions with regard to repairs indicated an intent to waive the notice provision of The Lease or, at the very least, that it did not consider Caldor's breach substantial. It was the result of years of behavior by Newburgh, upon which Caldor reasonably relied. To allow Newburgh to use the notice provision as a defense would elevate form over substance. *In re PCH Associates*, 949 F.2d 585, 597 (2d Cir.1991).

Therefore, I find that Newburgh is responsible for all repairs to the roof, including replacement if necessary. In addition, Newburgh shall pay Caldor the sum of $33,515.00, which represents the stipulated cost of merchandise damaged due to the leaks.

Parties are directed to settle a judgment consistent with this decision.