RELTRON CORPORATION, Formerly AMERICAN BOWLING ENTERPRISES, INC., Respondent, v VOXAKIS ENTERPRISES, INC., et al., Appellants.

Fourth Department, April 15, 1977

*Woods, Oviatt, Gilman, Sturman & Clarke (Harry P. Messina* of counsel), for appellants.

*Frank & Garrity (Bernard A. Frank* of counsel), for respondent.

GOLDMAN, J. Defendants Voxakis Enterprises, Inc. [Voxakis] and P. K. Management Corporation [P.K.] appeal from a judgment which declared that plaintiff-respondent Reltron

Corporation (formerly American Bowling Enterprises, Inc.) [Reltron] is entitled to use a parking area at the rear of premises at 1749-1755 East Avenue, Rochester, N.Y., in connection with Reltron's bowling business, free and clear of any right of appellants to use the area. The judgment also enjoined appellants from such use during the term of Reltron's lease. Appellant Voxakis is the owner of the lot at 1749-1755 East Avenue which includes the parking area, and appellant P.K. leases a building from Voxakis at that address, in which it operates a Pizza Kitchen restaurant. Reltron's bowling business, known as Brighton Bowl, is conducted at 1717 East Avenue.

Brighton Bowl was built in 1955 by 112 South Avenue, Inc., which then owned the lots at 1717 and 1749-1755 East Avenue. The lots lie on the south side of East Avenue and are separated by a middle lot, 1743 East Avenue, which was then owned by one Howard Kessler. Parking for patrons for Brighton Bowl was available in three parking areas surrounding the establishment. The north, or front, portion of 1717 East Avenue was one such area. A second, known as the "lower parking area", was the south, or rear, portion of 1743 East Avenue, where 112 South Avenue, Inc. had arranged for parking under a 1954 written lease with Kessler. The third parking area was the one now in dispute—namely, the south, or rear, portion of 1749-1755 East Avenue, known as the "upper parking area".

In November, 1958 112 South Avenue, Inc. entered into a written agreement to build and lease a trading stamp redemption store to Top Value Enterprises, Inc. on the lot at 1749-1755 East Avenue. In the lease agreement, 112 South Avenue, Inc. undertook to "Provide a hard surfaced blacktopped off-the-street parking area sufficient to accommodate approximately fifty (50) cars" and to "Provide adequate entrance and exit doors to the parking area at the rear of the premises". The lease agreement was signed on behalf of the lessor by "Fred Forman, Treas." The building constructed for Top Value included an east wing with spaces for three smaller stores. In 1959 those spaces were leased to Lilac Laundry, Inc., Salon D'Andre, Inc., and Mildred Tuttle, respectively. In each of the three leases 112 South Avenue, as lessor, agreed "to grade and install a blacktop parking area on or before June 1, 1959, or as soon thereafter as is possible, and to permit the tenant adequate equal parking facilities with other tenants of

the building of which the demised premises are a part". The record reveals that at least two of the three leases were signed on behalf of the lessor by "Fred Forman, Treas."

On or about June 1, 1959 the properties at 1749-1755 East Avenue were transferred by 112 South Avenue, Inc. to Raye-Namrof, Inc. Both corporations were closely held and had some of the same principals, including members of the Forman family. Raye-Namrof, Inc. was consolidated with B. Forman Company into B. Forman Company, Inc. in October, 1961.

The lease under which Reltron claims exclusive use of the upper parking area was negotiated in 1960 between American Bowling Enterprises, Inc. (which later became Reltron Corporation) and 112 South Avenue, Inc. By a written agreement dated August 5, 1960, 112 South agreed to sell to American the equipment and other personalty of Brighton Bowl and to lease to American the premises in which the business was conducted. The agreement provided that a lease to be executed later would demise to American the upper parking area, which was described in the agreement as being "presently used as a parking area under a verbal lease from Raye-Namrof, Inc. to 112 South Avenue, Inc." The agreement was signed on behalf of 112 South by "Fred Forman, Treas."

By written lease dated September 1, 1960 the upper parking area was demised to American for a monthly rental of $150. The lease described the parking area as follows: "The parking lot in the rear of the building located at 1749-1755 East Avenue *as now used in connection with the operation of Brighton Bowl,* and being part of the premises conveyed to the landlord by deed recorded in Monroe County Clerk's office on June 1, 1959 * * * said premises to be used for a parking lot only" (emphasis supplied). The lease named Raye-Namrof, Inc., rather than 112 South Avenue, Inc., as lessor, but it was signed on behalf of Raye-Namrof by "Fred Forman, Treas." The lease further provided that its term would be coincident with the term of a lease dated August 5, 1960, by which 112 South Avenue, Inc. had demised the Brighton Bowl premises at 1717 East Avenue to American Bowling for 20 years with two 10-year renewal options. The latter lease was also signed on behalf of the lessor by "Fred Forman, Treas." At the time of trial in February, 1975 Reltron, as successor to American, paid rent for Brighton Bowl to Raye-Namrof, Inc., as agent for

the shareholders of 112 South Avenue, Inc., which had been liquidated in 1964.

In 1967 Top Value entered into a new lease with B. Forman Company, Inc. (which had by then acquired title to the properties at 1749-1755 East Avenue) in which the lessor agreed "to permit Lessee, its customers, employees, and invitees to use the parking area adjoining the demised premises to the side and the rear thereof". By a later agreement, the term of the lease was extended until May 31, 1972.

On May 8, 1972 B. Forman Company, Inc. conveyed the 1749-1755 East Avenue properties by deed to defendant Voxakis. On October 4, 1973, Top Value having failed to renew its lease, Voxakis leased the former Top Value store to P.K., which remodeled the building and opened it in February, 1974 as a Pizza Kitchen restaurant. The lease purported to grant to P.K., its customers, employees and suppliers "the right * * * to park their vehicles on the premises outlined on schedule 'A-2' in common with other tenants of 1749-1755 East Avenue and, as to the rear parking area, in common also with American Bowling Enterprises, Inc. [now Reltron]". "Schedule 'A' " was a map of the lot at 1749-1755 East Avenue which clearly showed a large blacktopped area in the rear, or south (i.e., the "upper parking area"), and a smaller blacktopped area in the northeast corner.

Customers, employees and suppliers of the Pizza Kitchen restaurant began using the upper parking area regularly. When Reltron's protest letter in September, 1974 failed to dissuade Voxakis and his tenants from using the area, Reltron commenced this action. After trial the court issued a memorandum decision expressing the view that Reltron was obliged to share the upper parking area with the tenants of the small shops on the 1749-1755 East Avenue lot whose leasehold interests "were created prior to the date of the lease of [the upper parking area] to the plaintiff in this action". But because plaintiff's September 1, 1960 lease antedated the October 4, 1973 lease from Voxakis to P.K., Trial Term reasoned that "No parking privileges remained in this area for transfer to the co-defendant, P.K. Management Corporation", so that Reltron was entitled to declaratory and injunctive relief.

We first address the question whether Voxakis was bound by the terms of the September 1, 1960 lease between Raye-Namrof, Inc. and Reltron's predecessor. "The owner of leased

property may sell it and if there is no reservation the grant conveys the lessor's interest in the lease" *(Grover v Norton,* 113 Misc 3, 4). Similarly, the transfer of the lessor's reversion is a transfer of the lease and of its rights and obligations, whether with the consent of the tenant or without it *(Kilmer v White,* 254 NY 64, 69; *Matter of O'Donnell,* 240 NY 99, 105; see Real Property Law, §§ 223, 248), and whether or not there is a formal assignment of the lease *(Clemente Bros. v Peterson-Ashton Fuels,* 29 AD2d 908, 910; *Stogop Realty Co., v Marie Antoinette Hotel Co.,* 217 App Div 555, 560-561; 33 NY Jur, Landlord and Tenant, § 69). The purchaser of the realty takes subject to the rights of the tenant under the lease if he has notice, actual or constructive, of the lease's existence (3 Warren's Weed, New York Real Property, Leases and Lettings, § 7.05; see, *Bank of New York, Albany v Hirschfeld,* 37 NY2d 501, 506; *Walker v 18th Street Holding Corp.,* 267 App Div 141, 144-145; *Schoellkopf v Coatsworth,* 55 App Div 331, 334, affd 166 NY 77; *Grover v Norton, supra,* p 4). Here the conveyance of the 1749-1755 East Avenue properties from B. Forman Co., Inc. (successor to Raye-Namrof, Inc.) to Voxakis was by warranty deed without reservation, and it therefore transferred to Voxakis Raye-Namrof's interest in the September 1, 1960 lease with Reltron's predecessor. Moreover, the record leaves no doubt that Voxakis had notice of Reltron's lease at the time of the sale. Voxakis's purchase offer proposes that "transfer of title will be subject to the existing leases covering portions of the above described property, the essential terms of said leases being shown on a statement attached hereto and made a part hereof". The attached statement recites that "Brighton Bowl, Inc." has a lease for "rear parking" at an annual rental of $1,800 which expires "8/31/80" with two 10-year renewal options. In addition we have the trial testimony of George P. Voxakis, president of appellant Voxakis Enterprise, Inc., who negotiated the purchase. Mr. Voxakis acknowledged that he signed the purchase offer but stated that he did not examine the Reltron lease until a month or two after the purchase. He also indicated that he was the tenant of a diner next to the Top Value store for some 10 years prior to the purchase; that during that time he saw bowlers park in the upper parking area; and that he believed "Top Value had the right to park 50 vehicles back there, and the rest of the parking lot * * * was for the bowlers".

Having concluded that Voxakis purchased with notice of Reltron's September 1, 1960 lease and was therefore bound by its terms, we turn to the problem of interpreting the lease. Where a lease provides that a demised property shall be used for a specified purpose, such a provision will generally be enforced by the courts (3 Warren's Weed, New York Real Property, Leases and Lettings, § 10.18). The September 1, 1960 lease between Reltron's predecessor and Voxakis's predecessor demised the upper parking area "as now used in connection with the operation of Brighton Bowl" and specified that it was "to be used as a parking lot only". Our question is whether, as Reltron claims, the lease gave Reltron sole and exclusive possession of the parking area or whether, as Voxakis contends, Reltron's use of the area was to be in common with the tenants of 1749-1755 East Avenue.

The legal principles to be applied in construing a lease are familiar enough. "A lease, like any other contract, is to be interpreted in light of the purposes sought to be attained by the parties" *(Farrell Lines v City of New York,* 30 NY2d 76, 82). It should be interpreted as a whole, all writings forming parts of the same transaction being viewed together *(North Shore Mart v Grand Union,* 58 Misc 2d 640, 643). It is to be construed so as to carry out the parties' intent, gathered if possible from the language of the lease *(Matter of Loew's Buffalo Theatres,* 233 NY 495, 499; *Orr v Doubleday, Page & Co.,* 223 NY 334, 341; *Arrathoon v Pergament Oceanside Corp.,* 53 Misc 2d 959, 961, affd 26 AD2d 626, affd on opn at Special Term 19 NY2d 923, 924; *Pyramid Investors Co. v Medina-Maple, Inc.,* 72 Misc 2d 893, 895), or as it is sometimes put, "from the four corners of the instrument" *(Buell v Kresge Co.,* 177 Misc 686, 687, affd 263 App Div 931). To the extent that such intent is demonstrated by the expression of the parties in the lease, that expressed intent will control *(Raleigh Assoc. v Henry,* 302 NY 467, 473; 33 NY Jur, Landlord and Tenant, § 78). If it can be said that the language of the lease is plain and unambiguous as a matter of law, then the court must limit itself in construing the lease to the intention of the parties as found in the language used to express their intention, and resort may not be had to extrinsic evidence of the intentions or acts of the parties *(Brainard v New York Cent. R. R. Co.,* 242 NY 125, 133; see *Wendel Foundation v Moredall Realty Corp.,* 282 NY 239, 244). It is only where there remains an ambiguity after examination of the language of the lease

that parol evidence may be received to aid in its construction *(Arrathoon v Pergament Oceanside Corp.,* 53 Misc 2d 959, 961, *supra;* 3 Warren's Weed, New York Real Property, Leases and Lettings, § 10.02). Even then, parol evidence may only be used to fix the meaning of words of doubtful import and cannot contradict the express terms of the writing *(Brainard v New York Cent. R. R. Co., supra,* p 133). On the other hand, it is said that if several reasonable constructions of the lease are possible, the court may look to surrounding facts and circumstances to determine the intent of the parties *(67 Wall Street Co. v Franklin Nat. Bank,* 37 NY2d 245, 248). Among such facts and circumstances, the parties' practical interpretation of the lease for any considerable period of time before the controversy arose can assume particular significance *(City of New York v New York City Ry. Co.,* 193 NY 543, 548; *New York Cent. R. R. Co. v New York, New Haven & Hartford R. R. Co.,* 24 Misc 2d 414, 428, mod 13 AD2d 309; see *Town of Islip v Smith,* 3 AD2d 726; *507 Madison Ave. Realty Co. v Martin,* 200 App Div 146, 153, affd 233 NY 683; 3 Warren's Weed, New York Real Property, Leases and Lettings, § 10.02), although resort to this method of discovering contractual requirements is not had where the language of the agreement is plain and unambiguous and its legal effect unquestionably settled *(Allen v Oscar G. Murray R. R. Employees Benefit Fund,* 189 NYS 201, 204; 33 NY Jur, Landlord and Tenant, § 81).

We are of the opinion that Reltron's lease of the upper parking area—and specifically the phrase, "as now used in connection with the operation of Brighton Bowl"—is ambiguous and therefore subject to parol interpretation. Mindful that "words are never to be construed as meaningless if they can be made significant by any reasonable construction" *(67 Wall Street Co. v Franklin Nat. Bank,* 37 NY2d 245, 248), we think that the words "as now used" permit and indeed compel resort to parol evidence to determine how the upper parking area was used at the time when Reltron's lease was executed.

It will be recalled that in its November 20, 1958 lease to Top Value Enterprises, 112 South Avenue, Inc. agreed to furnish Top Value with an off-street parking area sufficient to accommodate approximately 50 cars. At trial there was some dispute as to the intended location of that parking area. Reltron contends that the parties in 1958 contemplated that the area would be in the northeast corner of the 1749-1755

East Avenue lot, where, according to Reltron, the three-store east wing attached to the Top Value store was not yet built or even planned. Mr. Emmett W. Williams, a witness for Reltron, testified that the northeast corner "probably" could have provided sufficient parking for 50 cars if the three-store wing had not been built, but that the present front parking area which remained after the building of the wing can only accommodate between 12 and 18 vehicles. The same witness seemed unsure when the east wing was added to the building plans, but he indicated that the Top Value store and the three smaller stores were built simultaneously. Moreover, there was testimony by witnesses affiliated with three of the four businesses (including Top Value) which were the original tenants of the 1749-1755 East Avenue Stores. They were unanimous in stating that their employees and customers used the upper parking area openly and continuously from the commencement of their tenancies in mid-1959—more than a year before the execution of the September 1, 1960 parking lease with Reltron's predecessor. Finally, it is noteworthy that the November 20, 1958 lease agreement between 112 South Avenue, Inc. and Top Value, which made reference to 50 parking spaces, also provided for the installation of "adequate entrance and exit doors to the parking area at the rear of the premises". This is evidence that the parties intended from the beginning that Top Value have parking rights in the upper parking area. Thus it is doubtful that the parties ever contemplated that Top Value's parking should be limited to the northeast corner of the lot. If there ever was such a plan, it was abandoned long before the execution of the September 1, 1960 lease under which Reltron claims. In short, the evidence definitely demonstrates that at the time of the execution of Reltron's lease the upper parking area was used in common by Brighton Bowl's patrons and by the employees and patrons of the four businesses at 1749-1755 East Avenue. Moreover, by that time 112 South Avenue, Inc. and Top Value, by their conduct, had given their 1958 lease a practical construction which recognized Top Value's right to use the upper parking area. From this it follows that Raye-Namrof (as successor to 112 South Avenue, Inc.) had neither the intent nor the legal right to confer exclusive parking rights on Reltron's predecessor when, by the September 1, 1960 lease, it demised the upper parking area "as now used".

The evidence as to the conduct of the parties during more

than a decade after the execution of Reltron's lease fortifies the conclusion that Reltron's rights in the upper parking area were not exclusive. Both Top Value and Lilac Laundry, without protest by Brighton Bowl, erected signs indicating that parking for their patrons was available in the upper parking area. Although Brighton Bowl erected signs inviting its patrons to park there, it did not erect signs warning others to stay out. Further, Top Value's 1967 lease with B. Forman Company, Inc. (successor to 112 South Avenue, Inc. and Raye-Namrof, Inc.) provided that Top Value's customers, employees and invitees would have use of the parking areas "to the side and the rear" of the Top Value store. This language, we think, evinces not an attempt to expand Top Value's parking rights but rather is a reaffirmation of the parking rights that already existed by virtue of the 1958 lease and the practical construction given to it by the parties through their conduct. It appears that Reltron and its predecessors and the tenants of 1749-1755 East Avenue shared the use of the upper parking area without significant friction for some 14 years, until after P. K.'s Pizza Kitchen restaurant opened on the former Top Value premises. Parking interference was first noticed in the fall of 1974, when customers of P. K.'s restaurant, which does the bulk of its business in the evening hours, began to compete for parking spaces with Reltron's evening league bowlers. It appears that no serious parking interference had occurred formerly because Top Value was largely a daytime business, though it was open two nights per week and for extended hours during the Christmas season.

In sum, we find that Reltron's predecessor did not enjoy exclusive use of the upper parking area prior to the September 1, 1960 lease and was not granted exclusive use by that lease. Top Value, by virtue of its earlier lease, enjoyed the right to use the area in common with Reltron's predecessor and to park some, if not all, of its authorized 50 vehicles there. When Top Value's last lease renewal expired on May 31, 1972, Top Value's interest reverted to Voxakis, which had by then become owner of the premises. Therefore, contrary to the conclusion reached by Trial Term, Voxakis did have sufficient interest in the upper parking area to support its transfer to P. K., by lease dated October 4, 1973, of the right to park cars in the upper parking area in common with Reltron. Accordingly, the judgment should be reversed, the injunction vacated and the complaint dismissed.

M<small>ARSH</small>, P. J., M<small>OULE</small>, D<small>ILLON</small> and W<small>ITMER</small>, JJ., concur.

Judgment unanimously reversed, on the law and facts, with costs, injunction vacated and complaint dismissed.