Marine Buffalo Assoc., L.P. v HSBC Bank USA (2003 NY Slip Op 51672(U))

[*1]

Marine Buffalo Assoc., L.P. v HSBC Bank USA

2003 NY Slip Op 51672(U)

Decided on December 9, 2003

Supreme Court, Erie County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 9, 2003

Supreme Court, Erie County
 
 MARINE BUFFALO ASSOCIATES, L.P., Plaintiff
against
HSBC BANK USA, Defendant.
Index No. 2002-6297

Hiscock & Barclay L.L.P.
Frank T. Gaglione, Esq., of counsel
Michael C. Driscoll, Esq.
Attorneys for Plaintiff
Three Fountain Plaza, 1100 M&T Center
Buffalo, New York 14203-1486
Phillips, Lytle, Hitchcock, Blaine & Huber
Michael B. Powers, Esq.
Attorneys for Defendant
Suite 3400, One HSBC Center
Buffalo, New York 14203-2887

Joseph G. Makowski, J.
This matter comes before the Court on a motion by Plaintiff Marine Buffalo Associates, L.P. ("MBA") for summary judgment on its complaint for a declaratory judgment against its tenant, Defendant HSBC Bank, USA ("HSBC"). HSBC has cross-moved for summary judgment in its favor. The papers submitted in support of and in opposition to the motions are listed on the attached addendum to this decision and order. Oral argument took place on June 6, 2003, and on June 18, 2003, the Court conducted an inspection of representative telephone and electrical closets at One HSBC Center. Counsel for Plaintiff and Defendant were present during the inspection. The Court now renders its decision.
Upon consideration of the contentions raised, the Court denies the motion and grants the cross motion.
BACKGROUND
The dispute stems from the use by HSBC of telephone & electrical closets at the building commonly known as One HSBC Center ("the Center") to house certain equipment. MBA, a New York limited partnership, is the current owner of the Center, which is located in downtown [*2]Buffalo (Gaglione Affid. ¶ 5).[FN1] HSBC's predecessor in interest, Marine Midland Bank, entered into a forty (40) year lease with MBA's predecessor in interest, CC&F Buffalo Development Co. ("CC&F") in 1972. [FN2] The Lease was executed prior to construction of the Center (see Exhibit 3 [Lease]), and the parties have since entered into at least nine (9) modifications. HSBC is a "full floor" tenant, i.e. on any floor of the Center on which it is present, it leases the entire floor (Falzone Affid. ¶ 15). Although the record is not clear on this point, apparently HSBC rents floors 7 through 27 and floor 38 of the high rise Tower at the Center, along with two floors in the basement and every floor in the lower rise wings of the Center.[FN3]
By letter dated May 10, 2000, MBA requested that HSBC remove certain items ("the subject equipment") from all "telephone and electric closets" serving floors 7 through 27 and 38 (hereafter "the Closets") (see Exhibit 15). There are two Closets on most floors of the Center. The Closets house both electrical and telecommunications wiring, "with the high voltage electrical side of the closet separated from the low voltage [telecommunications] side by a partition wall." The side for telecommunications in which HSBC houses the subject equipment measures approximately 10 feet long by 55 inches or 4' 7" wide (Exhibit 53 [report of MBA's expert, Randall Plimpton of Riser Management Systems, L.P.] at 7; see also Appendix C [drawings of typical closet layout with and without HSBC equipment, showing telecommunications side to be four feet two inches wide from wall to wall]). According to MBA's expert:

"***[A]ll but two of the [Closets] on floors occupied by HSBC Bank contain telecommunications equipment. All but four [Closets] contain a 19-inch floor-standing equipment rack that supports either 'active' electronic equipment (i.e. multiplexers, hubs and routers), 'passive' equipment (patch panels), or a combination thereof ***."
(Exhibit 53 at 8). The equipment racks, which are standard size for the industry (see Plimpton EBT at 106), are 7 feet tall and 19 inches wide (Exhibit 53 at 2, Appendix A).
The May 2000 letter from Stephen Fitzmaurice, the Property Manager for MBA, ordered HSBC to remove the subject equipment from the Closets because the Closets were "common area space".

"The telephone and electric closets in the building are common area space. More specifically, the space in these closets allows for the distribution of telecommunication and electricity to all tenants of [the] Center. Therefore, we [*3]request that all the computer equipment racks be removed by June 15, 2000."
(Exhibit15 [emphasis supplied]).
HSBC responded in July 2000, refusing to remove the subject equipment from the Closets. The bank alleged that, during the planning for and installation of HSBC's so-called "PDS" Program in 1989, MBA had agreed to allow HSBC to install the subject equipment (see Exhibit 16).
In a responding letter dated August 11, 2000, MBA alleged that, according to Daniel Morrow of R.P. Morrow Associates, the consulting company that had overseen the PDS Program for MBA, that project was intended to replace rented coaxial cable with conduit-enclosed wiring, and the project was allegedly 99 percent complete by 1989 (Exhibit 17). MBA stated:

"***[W]e see no evidence that HSBC sought or received permission to install the computer equipment, racks, cable trays, patch panels, etc. that now exist in almost all the telephone and electric closet [sic] on HSBC floors."
(Exhibit 17). The bank was again asked to remove the equipment.
In January 2002, MBA again wrote to HSBC requesting removal of the equipment from the Closets. MBA contended that the Closets were not within HSBC's rentable space under the Lease (Exhibit 5). MBA asserted that, if the parties were unable to agree to a timetable for the removal of the equipment by January 31, 2002, MBA would pursue other means to have the equipment removed (id.)
HSBC responded on January 11, 2002. HSBC contended that the Closets constituted common areas.

"The HSBC Equipment was installed in the Building during HSBC's occupancy without the objection of the Landlord. Therefore the Lease grants Tenant the right to use the electrical closets, the requirements for the use of the electrical closets have been met and no additional rent is due and payable under the Lease with respect to such use.
*** Nor do we understand your statement that the closets were never intended for this use. While during negotiations of the 1972 Lease Landlord and Tenant could not predict with certainty the enormous advances in telecommunications at the turn of the millennium, intentions regarding the use of electrical closets surely included providing proper access for the adaptation to such change."
(Exhibit 32). Although stating that HSBC believed it could perform upgrades of the equipment in the closet "as of right under the Lease", HSBC nonetheless requested that MBA consent to such work prior to January 22, 2002. Responding to MBA's threat to remove the existing equipment, HSBC's letter stated:

"Since you are well aware that the HSBC equipment is essential to our entire North American operations, clearly you must recognize that the damage that would be caused by any interference with our equipment would far exceed MBA's equity interests in the building."
[*4]
(Exhibit 32 [letter from Margaret L. Evans, Vice President Facilities Management Dept, HSBC]).
The complaint was filed in June 2002, and seeks a declaratory judgment against HSBC, that (A) HSBC is not entitled to use, occupy and/or access the Closets for the subject equipment; (B) HSBC must pay a reasonable access or licensing fee for its past use and occupancy of the Closets for the equipment; (C) HSBC is in breach of the Lease and must immediately remove all such equipment from the Closets; or, (D) in the alternative, MBA is entitled to be paid a reasonable access or license fee for HSBC's continued and future use and occupancy of the Closets and to be indemnified by HSBC for damages and costs incurred by MBA in connection with such use (Complaint at 8). HSBC answered the complaint and, after significant discovery, the parties cross-moved for summary judgment.
DISCUSSION
Initially, MBA contends that, pursuant to the terms of the Lease, HSBC was required to request permission from MBA prior to installing floor racks and electronic equipment in the Closets. Because no such permission was sought, MBA contends, HSBC has violated the terms of the Lease and MBA is entitled to a declaratory judgment requiring HSBC to immediately remove the equipment and to pay money damages based upon the value of HSBC's use and occupancy of the Closets to date (MBA Memo of Law at 3). MBA further contends that it did not waive its right to object to the presence of the subject equipment. It contends that the subject equipment is not "mechanical" and differs markedly from the "small connections previously located on the walls" of the Closets (MBA Memo of Law at 8). The subject equipment was, according to MBA, installed between 1997 and 1999 as part of HSBC's so-called "WAY FORWARD PLAN" to upgrade its networking equipment (id.). MBA contends that it did not discover the presence of the equipment until early 2000 and immediately demanded its removal (see Fitzmaurice EBT at 32; Exhibit 15). Further, MBA notes that the Lease contains a non-waiver clause (MBA Memo at 9, citing Exhibit 3, Lease §12.15).
In response, HSBC contends that the Lease permits HSBC to use the common area Closets, and MBA has admitted in correspondence that the Closets are common areas; the Closets were designed to house the subject equipment; HSBC has a common law right to use the Closets; MBA's own documents, employees and contractors confirmed that MBA was always aware that HSBC housed its telecommunications equipment in the Closets and MBA never questioned the use or objected until May 2000; MBA gave express written consent in 1998 to HSBC's use of the Closets to house telecommunications equipment; MBA has fabricated the harm allegedly due to HSBCs current use of the Closets to help coerce concessions on other issues between the parties; the Lease was modified in 1999, and that modification estops MBA from relying on the subject equipment as a breach (Memo of Law at 3-40). Thus, HSBC contends that the Lease itself, the practical construction of the Lease by the parties, MBA's admissions and the subsequent modification of the Lease entitle it to summary judgment. Finally, HSBC contends that MBA's claims are barred by the statute of limitations (HSBC Memo of Law, 29-50).
For the reasons recited below, as the Court interprets the Lease, which it finds to be unambiguous, the Court determines that the Closets are common area space. Because the Closets are common area space, MBA has failed to establish a right to summary judgment on the Lease provisions upon which it relies, and its motion is denied.
[*5]
On the other hand, HSBC has established as a matter of law that the equipment currently in the Closets is different only in extent, and not in type, from the equipment that has been there since the 1970s, and that MBA knew in 1998 that the subject equipment on racks was present in the closets and failed to object. The modification of the Lease in 1999 estops MBA from claiming a breach on that basis. HSBC is entitled to summary judgment as a matter of law because, as discussed below, MBA has failed to raise an issue of fact for trial whether the presence of the subject equipment in the Closets is a breach of the Lease.
Initially, "[t]he objective in any question of the interpretation of a written contract *** is to determine what is the intention of the parties as derived from the language employed" (Hartford Acc. & Indem. Co. v Wesolowski, 33 NY2d 169, 171 [1973] [internal quotation marks omitted]). It is the Court's responsibility to interpret written instruments, in the absence of ambiguity (id. at 172). Thus,

"[w]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language ***. [W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms"
R/S Assoc. v New York Job Develop. Auth., 98 NY2d 29, 32 [2002] [internal quotation marks omitted]). "A lease, like any other contract, is to be interpreted in light of the purposes sought to be attained by the parties" (Farrell Lines v City of New York, 30 NY2d 76, 82 [1972]; see also Reltron Corp v Voxakis Ent., Inc., 57 AD2d 134, 139-140 [4th Dept 1977]). Finally, "[i]t is well settled that no additional liability or requirement will be imposed upon a tenant by interpretation unless it is clearly within the provisions of the instrument under which it is claimed" (67 Wall St. Co. v Franklin Nat. Bank, 37 NY2d 245, 249 [1975]; see 455 Seventh Ave. v Frederick Hussey Realty Corp., 295 NY 166 [1946]).
HSBC contends that the Lease should be construed against MBA, but the Court declines to do so. Because HSBC, like its predecessor, is the tenant of approximately eighty (80) percent of the Center (see Exhibit 32), the Court presumes for the purpose of these motions that the Landlord and the Tenant had at least equivalent bargaining power with respect to the terms of the Lease.
The Lease provides that the "Premises" is the area leased to the Tenant, HSBC (Exhibit 3, Lease §1.1.1). The Lease further provides in section 2.5:

"2.5 Measurement of Rentable Space. For all purposes of this Lease, Rentable Space shall be computed to include all floor areas within the exterior walls except stairways, elevator shafts, flues, stacks, pipe shafts, vertical ducts, air conditioning rooms, fan rooms, electrical and telephone closets and janitors' closets all with their enclosing walls. Common areas such as entrance ways, corridors and public lobbies affording access to and within the Improvements by all tenants thereof shall not be included as Rentable Space, but common corridors, elevator lobbies and lavatories on Typical Office Floors shall be included with a proportionate amount thereof attributed to each occupant of such floor. ***"
(Exhibit 3, Lease §2.5 [emphasis supplied]). Thus, the Lease specifically provides that the [*6]Closets are not "Rentable Space"; it does not specifically define them as "common areas". There is a separate provision with respect to appurtenances.

"2.2 Appurtenances. In addition to all facilities which serve Premises exclusively, Tenant shall have the right to use in common with Landlord and other tenants of the Improvements:
(a) the common lobbies, corridors, stairways, elevators and loading platform of the Improvements, and the pipes, ducts, conduits, wires and appurtenant meters and equipment serving the Premises in common with other areas;
(b) common walkways and driveways necessary for access to and within the Improvements; and
(c) if the Premises include less than all of the Rentable Space of any floor, the lavatories, elevator lobbies and common corridors of such floor."
(Exhibit 3, Lease § 2.2 [emphasis supplied]). Because HSBC is a "full floor" tenant, as noted earlier, subparagraph (c) is inapplicable. However, section 2.2 clearly permits HSBC to use "the pipes, ducts, conduits, wires and appurtenant meters and equipment serving the Premises in common with other areas" (emphasis supplied). Further, as HSBC contends, the Closets are expressly excluded from the Rentable Space (see Exhibit 3, Lease § 2.5) but are not excluded from the definition of appurtenances or common areas (Exhibit 3, Lease § 2.2). Because the "conduits and wires" run through the Closets throughout the building, and because the Tenant must tap into that wiring in those Closets in order to direct electricity/telecommunications onto the floors, the Lease plainly permits the Tenant to have horizontal connections in the Closets and therefore, in that sense, the Closets are "common area space".
Even if the Lease were deemed to be ambiguous on this point, the Court notes that, in correspondence predating the instant lawsuit, MBA's Property Manager Stephen Fitzmaurice referred to the Closets as "common area space" (Exhibit 15). Again, in a letter dated October 16, 2001, relating generally to disputes between the parties, Fitzmaurice stated:

 "***On several occasions we have indicated to you *** our desire to settle the outstanding issues such as this topic as well as the expired lease for the seventh floor, the equipment HSBC has placed in the common area telephone and electric closets, etc. This is the sole reason we have not taken legal action to force the payment of HSBC's past due escalation billings ***."
(Falzone Affid., Doc. 2 [emphasis supplied]). These admissions by MBA constitute evidence extrinsic to the Lease (see Tri Town Antlers Fdn. v Fireman's Fund Ins. Co., 158 AD2d 908, 909 [4th Dept], affd 76 NY2d 841 [1990]). "If it can be said that the language of the lease is plain and unambiguous as a matter of law, then the court must limit itself in construing the lease to the intention of the parties as found in the language used to express their intention, and resort may not be had to extrinsic evidence of the intentions or acts of the parties" (Reltron Corp., 57 AD2d at 139). MBA contends that the Lease unambiguously excludes the Closets from common and rentable space areas. The Court construes the Lease differently. Even if MBA's interpretation were deemed a reasonable alternative, with the result that the provisions in question were to be considered ambiguous and extrinsic evidence were admissible to aid in the construction of the [*7]Lease, the admissions of MBA's agents would be weighed heavily by the Court.
However, construing only the four corners of the Lease, the Court determines that the Closets are common area space.
The issue remains concerning what precise use of the Closets by HSBC is permitted. MBA contends that the only permitted use by HSBC of such Closets is for telecommunications wiring and cross connections between horizontal and vertical wiring (see e.g. MBA's Expert Report, Exhibit 53, at 7). Further, MBA contends that HSBC was required to seek its permission before placing the subject equipment in the Closets. Lease § 7.1 provides in part:

"***Tenant shall have the right, subject to the prior approval of the Landlord, to install wires, conduits, pipes, mechanical equipment and related or similar facilities within the Premises and the portions of the Improvements outside the Premises designed or used for such facilities. Tenant shall deliver to the Landlord plans and specifications for any work herein referred to a reasonable time prior to starting work thereon and copies of construction contracts therefor."
(Exhibit 2, Lease §7.1 [emphasis supplied]). MBA further contends that HSBC never requested permission to install the racks or equipment in the Closets and, had such a request been made, MBA would have withheld consent (Memo of Law at 3-4). HSBC contends, however, that HSBC has used the closets to house its "telecommunications" equipment for nearly 30 years with no objection from MBA (HSBC Memo of Law at 6-16, 33, citing Achman Affid. ¶13, Hindle Affid. ¶ 6, 9, 15; Hibit Affid. ¶ 12).
The Court determines, based upon the undisputed proof submitted by HSBC, that HSBC has proven by evidence in admissible form that it has placed similar types of equipment for its computer system in the Closets since 1974. Whether the subject equipment is technically "telecommunications" equipment or purely mechanical equipment, as defined by MBA, is, for the purposes of this legal dispute, a matter of semantics. The equipment currently in the Closet is different only in extent, not in type, from the network/telecommunications/computer equipment HSBC has placed there since the1970s.
The evidence relied upon is as follows. David Falzone is currently the Manager of Information Technology (IT) Operations for HSBC and has been with the bank since 1970. Falzone testified at an EBT that HSBC first installed coaxial cable through the Closets beginning in 1974 (Falzone EBT at 6-7, 49-51). HSBC at that time also had video controllers, machines standing 26 inches high, 30 inches wide, and 20 inches deep, on every third or fourth floor Closet (id. at 56; Falzone Affid. Docs. 3-7 [pictures of video controller]). At the time, HSBC had no local area network (Falzone EBT at 52). The video controller converted the data it received, stored it and sent it down to mainframe computers in the basement of the Tower or out to terminals on the floor (Falzone EBT at 51-53). The video controllers were removed from the closets by the early to mid-1980s, and were replaced by multiplexers (Falzone EBT at 64-66). Some of the multiplexers were installed on freestanding racks and some were affixed to the wall. Personnel employed by MBA's predecessor assisted in building the shelves for the multiplexers (Falzone EBT at 68, 72-73). Then, in 1989, HSBC undertook a project to install its own cables ("the PDS Program") to replace the New York Telephone cables which it had been renting (Falzone EBT at 85-86). HSBC installed its own twisted pair and fiberoptic cables (id. at 86; [*8]Exhibit 42 at 2). Around the same time HSBC started implementing a local area network ("LAN") (Falzone EBT at 93-94).
Falzone further testified that HSBC began migrating the multiplexers out of the Closets and down to the basement beginning in 1990. Between1990 and 1996, HSBC began installing "Token Ring hubs" in the closets (Falzone EBT at 95-97).[FN4] Although Falzone had installed some Ethernet hubs as far back as1987 (Falzone EBT at 48,135), the hubs now located in the Closets are primarily Token Ring hubs, the type installed in the mid 1990s. The hubs were installed on the old multiplexer racks or on freestanding racks (id. at 98). In 1997, the new hubs were placed on metal racks (id. at 48, 130-131). According to Falzone, HSBC has always had racks on the floor in the Closets (id. at 136, 139).
This testimony, which is essentially undisputed, establishes that HSBC has had equipment stored in the Closets since the 1970s which took signals/data that came up through the Tower vertically into the Closets from HSBC's mainframe and other computers located in the basement, and which converted and/or analyzed the signals/data and sent them/it to terminals or personal computers on the floor in the Premises. The current equipment consists of Token Ring Hubs, the prior equipment consisted of video controllers, multiplexers and Arcnet or Ethernet Hubs but they perform/performed essentially the same functions (Falzone Affid. ¶ 27-29).
Further, Robert Achman, who was employed by Ferguson Electric Company from 1961 through 2001, provided evidence to support that of Falzone. Achman worked on the construction of the Center (Achman Affid. ¶ 1). Thereafter, Achman continued to work for Ferguson Electric at the Center as a supervisor and in other positions until his retirement in 2001 (id. ¶¶ 1, 6). In those positions, Achman frequently visited the Closets (id. ¶ 7). He observed free-standing controllers on the floors in a number of the Closets in the late 1970s and early 1980s, but most were replaced by multiplexers prior to 1986 (id. at 9). In the mid-1980s, Achman helped install HSBC's multiplexers in the Closets, assisting in building the wooden racks. According to Achman, newer telecommunications equipment replaced the multiplexers in the Closets in the early 1990s, but he was unfamiliar with that equipment. He asserted that that equipment was housed in the Closets on metal floor-standing racks in the early 1990s. Those racks have a base approximately 19 inches wide and 20 inches deep and are approximately 7 feet tall. Those racks were still in the Closets when Achman retired in 2001 (id. ¶¶ 11-13). Achman further asserted:

"Employees of the Center, including their maintenance personnel, periodically inspected the Closets during my tenure with Ferguson in the 1970s, 1980s and 1990s. At no time from the late 1970s until 2001, when I retired, did any of the building owners or representatives of building management tell me that [HSBC] was not permitted to house its telecommunications equipment in the Closets. Nor [*9]was I aware of any such statement being made by the building owners or any representative of building management to anyone else."
(Achman Affid. ¶ 13; see also Hindle Affid ¶¶ 3-15; Hibit Affid. ¶¶ 9-12).
MBA contends that pursuant to section 7.1 of the Lease, HSBC was required to obtain its approval prior to "install[ing] wires, conduits, pipes, mechanical equipment and related or similar facilities within the Premises and the portions of the Improvements outside the Premises designed or used for such facilities" (Exhibit 3, Lease § 7.1). According to HSBC, however, such "approval" was given continuously on an oral or tacit basis, and expressly in 1998. MBA's Albert J. Kruger, then Senior Manager for MBA's management company, wrote to HSBC on May 15, 1998 advising that an electrical circuit had been shut down in the Closet on the 28th Floor of the Center on April 16, 1998. When this occurred, MBA employees noticed that some of HSBC's equipment was plugged into MBA's emergency circuit. Mr. Kruger wrote:

"I ask that your firm remove any equipment presently plugged into a building emergency circuit. Please remind all appropriate parties that all tenant systems are to be hard wired to regular distribution panels as dedicated circuits with breaker locks."
(Exhibit 6). Thereafter, MBA's chief engineer Jeffrey Grieve met with HSBC employees and provided a list of Closets where HSBC was using the Center's emergency power for its equipment (Grieve EBT at 18, 22-23; Exhibit 35). HSBC hired Ferguson to construct circuits in the Closets to connect the equipment (Falzone Affid. Document 12). There is no evidence in the record that MBA complained at that time concerning the location of any of the equipment in the Closets.
In any event, New York law permits a tenant to make non-structural alternations even without the landlord's consent if necessary to carry on the tenant's business.

"This is true even where the lease requires that no alterations may be made without the landlord's consent; provided, however, that such alterations will not injure the reversion, and provided, further, that they are reasonably necessary to enable the tenant to use the premises in the manner set forth in the lease."
(Williams v Ron-Jay Enter. Inc., 65 AD2d 213, 218 [4th Dept 1978] [internal quotation marks omitted]; see also Rumiche Corp. v Eisenreich, 40 NY2d 174, 179-180, rearg denied 40 NY2d 918 [1976]; National Bank of N. Amer. v Brook Shopping Centers, Inc., 115 AD2d 461 [2d Dept 1985], lv denied 68 NY2d 603 [1986]; Harrar Realty Corp. v Michlin & Hill, Inc., 86 AD2d 182, 186 [1st Dept], appeal dismissed 57 NY2d 607 [1982]). Further, the existence of a non-waiver clause does not prevent the waiver of a lease requirement (see e.g. 61 East 72nd St. Corp. v Zimberg, 161 AD2d 542, 543 [1st Dept 1990]).
The Court also notes that the Ninth Modification of the Lease, which was executed in 1999 (see Falzone AFfid. Doc. 53), could estop MBA from claiming that the presence of known equipment in the Closets prior to that time is a breach of the Lease (see N.& S. Decor Fixture Co. v V.J. Enter., 57 AD2d 890 [1977] [entering into modification of lease estops landlord from claiming breach due to prior alteration]).
[*10]
The final issue is the alleged harm to MBA from the presence of the subject equipment in the closet, as presented by MBA's expert Randall Plimpton in his report and affidavit. Mr. Plimpton avers that there are primarily six (6) technical reasons why the subject equipment should not be located in the Closets which, in his opinion, "while well designed, are not designed to provide floor space for free-standing equipment racks" (Plimpton Affid. ¶ 10 [a]). The six reasons are given as follows:

a.The closets *** are not designed to provide floor space for free-standing equipment racks and/or active electronic equipment;
b.The racks, equipment and hardware in these closets present at least two (2) hazards: occupational/navigational and service. This equipment may cause personal injury to individuals working in the [Closets] and may become disconnected which would likely interrupt the service provided by the equipment;
c.Placing this sort of equipment in the [Closets] creates the need for HSBC or its representatives to access the closets on a frequent basis, severely compromising building security;
d.The presence of this equipment in the [Closets] creates responsibilities and liabilities for MBA;
e.HSBC has drilled as many as four (4) cores through the floors of each of the [Closets] to accommodate cabling, thereby wasting valuable vertical pathway that could be used for installing floor-to-floor cabling for other tenants; and
f.The presence of this equipment *** makes it impossible for MBA to install a competitively neutral Communications Distribution System ("CDS") ***"
(Plimpton Affid. ¶ 10 [a] - [f]).
For the following reasons, the Court determines that Plimpton's opinions are speculative and are not based on the evidence in the case.
First, there was no evidence submitted of any personal injuries in the closets due to the subject equipment since the opening of the Center (cf. Fitzmaurice EBT at 63 [no tenants have complained about the risk of personal injury due to subject equipment]; Exhibit 1, at 10 [MBA's Responses to HSBC's First Set of Interrogatories [no documents regarding same]; Plimpton EBT at 87), although Plimpton testified that there were still tripping hazards from cables lying on the floor (id. at 88).
Plimpton cites to current building standards from the American National Standards Institute ("ANSI"), the Telecommunications Industry Association ("TIA") and Electronic Industries Alliance ("EIA") (see Exhibit 54, "Commercial Building Standard for Telecommunications Pathways and Space" No. 569A, Feb., 1998). Plimpton concludes that, in his opinion,

"there is not enough space in the [Closets] to allow for the location of standing floor racks which are 19" wide, 7' tall and 18 or more inches deep, regardless of where the equipment is placed in each closet. Quite simply, the closets were not intended for this purpose and cannot meet industry standards if this equipment is present."
[*11]
(Plimpton Affid.¶ 15). The standards referenced by MBA's expert set forth recommended size and spacing requirements for telecommunications closets in new buildings (see Exhibit 54, at 7.2-1). Depending on the square footage of the floor area served, the "minimum acceptable closet dimensions" are between 10 feet by 7 feet and 10 feet by 11 feet (see id. 7.2.2.3, 7.2-1). These standards, however, are completely irrelevant to a Lease of a building built in the 1970s. Plimpton agreed in his EBT that the standards have no relation to codes or other legal requirements and that there was no evidence that the Closets were out of code (see Plimpton EBT at 111; see also Exhibit 54, at Foreword [standard does not replace any Codes]).
With respect to security issues, there is unrefuted evidence that HSBC employees had keys to the Closets since 1973, along with other tenants (see Exhibit 1, attached documents ["Keys to Telephone/Electric & Electric Closets]). Mr. Plimpton testified that, upon Riser's inspection, all of the Closets were found to be locked (Plimpton EBT at 93). Mr. Plimpton further testified that he was unaware that MBA rules permitted contractors to have keys, as well (id. at 98). The Court notes the letter from Edmund Koral of HSBC to Stephen Fitzmaurice of MBA of Feburary 23, 2001 (Exhibit 68). In that letter, apparently written after MBA had changed the locks on the Closets and, then, upon request, provided some keys for HSBC employees, stated in part:

"Thank you for providing the Facilities Management Group and Information Technology Group four set of keys for the new locks placed on the telephone and electric closet doors in the tower and on the wings. Presently, it appears as if your procedure to improve on security to the closets is working. I will continue to monitor the results of this change, from HSBC's perspective, and I will keep you informed of the feedback I receive. ***
"As we previously discussed, HSBC is willing to work with building management in any reasonable capacity to limit liability to you or our equipment in the [Closets]. In addition, we would be willing to 'clean-up' the closets in a manner that was [sic] beneficial to both parties."
(Exhibit 68 [emphasis supplied]). The Court respects MBA's assertion of security concerns, however, this issue must, under the circumstances, be handled short of removal of the subject equipment from the Closets.
 With respect to the issue of MBA's risk of being held responsible for damage to HSBC's equipment, MBA's expert Plimpton asserts that the racks installed by HSBC "pose extreme navigational" hazards (Plimpton Affid. ¶ 11). HSBC counters that there was no evidence of harm to its equipment in the Closets over a 30 year period (see Memorandum of Law at 22). However, Chief Engineer for MBA, Jeffrey Grieve, testified that HSBC had complained to MBA in early 2000 about MBA doing work in "their electric closets"; MBA was running temperature sensors (Grieve EBT at 29-30). MBA performs yearly infrared studies on the electrical side of the Closets to check for "hotspots" on the circuit breakers (id. at 35-37). Grieve's memory of the complaint was that HSBC "felt we broke some connection of theirs, a fiber-optic or something and the cables were laying on the floor" (id. at 45). No liability followed that single complaint, and to posit such liability in the future is purely speculative.
With respect to the issue of other tenants' equipment in the closets, again, no complaints [*12]have been received by MBA from tenants concerning the integrity of their communication services because of HSBC's use of the Closets (see Exhibit 1, at 9; Fitzmaurice EBT at 63). In fact, there was only a single complaint, by a foreman for Ferguson Electric, who complained in the spring of 2000 that he had trouble working around the racks of equipment in the electrical closets (Fitzmaurice EBT at 64-65, 72-73; Exhibit 1 at 5).
With respect to the CDS System, Plimpton asserts in his expert report:

"A CDS, which is a state-of-the art telecommunications infrastructure that uniformly distributes fiber and cable media to all floors thereby giving tenants ready access to a choice of high-speed services from multiple [telecommunication service providers], will give [MBA] a flexible, fully designed system that meets the competitive requirements of the entire tenant community, a positive cash flow, and the crucial management of the CDS and the telecom spaces in the building."
(see Exhibit 53 at 3). MBA asserts that installing the CDS is impossible due to the presence of the subject equipment. This factor is irrelevant to the issue whether HSBC has breached the Lease, where the undisputed evidence shows that MBA has permitted similar equipment to reside in the Closets for decades. Further, Riser Management, the firm issuing the expert report, proposed to manage the CDS system and, thus, has a stake in its implementation (see Exhibit 53 at 15; Exhibit 58 [Plimpton's draft report, dated April 2001] at 12, 13). Finally, as HSBC notes, Plimpton admitted at his deposition that his original recommendation had been that an abandoned dumb waiter and mail room in the basement of the Center would be "ideal spaces" for installation of the CDS system (see Plimpton EBT at 70-76; Exhibit 58, at 3, 12).[FN5]
Plimpton did not find heat to be currently a problem in any closet (Plimpton EBT at 84-86), but testified that the potential for problems remained (id. at 85; see Fitzmaurice EBT at 65-66 [AC is turned off between 6:00 p.m and 8:00 a.m.]). Again, such harm is speculative and does not constitute a breach of the Lease.
Finally, it appears possible from MBA's documentation that it planned to use the Closet issue as leverage on other disputes between the parties. A memo dated November 2000 from MBA's former Property Manager to its Vice President Michael Verutto, defines the closets as "building common areas", and further states that the equipment was placed there without MBA's "required" consent. The memo further states in part:

"With respect to the use of the [Closets], perhaps you should give consideration to [*13]allowing [HSBC] to retain what equipment they currently have in there, subject to maintaining adequate access for building purposes, in exchange for some concession."
(Exhibit 7).
The Court determines that HSBC has established its entitlement to judgment as a matter of law for a declaration that it has not violated the Lease by placement of the subject equipment in the Closets, and MBA has failed to raise an issue of fact whether the harm it alleges constituted or constitutes a breach of the Lease.
The Court notes that the Lease at section 6.9 provides in part:

"6.9 Indemnification against Claims. Tenant shall defend, save harmless, and indemnify Landlord against loss or liability on account of injury or damage to any person or property resulting from any willful or negligent act or omission of Tenant or Tenant's agents, employees or contractors, or on account of any use made or thing done on the Premises or resulting from the failure of Tenant to perform and discharge its obligations under this Lease, or by law, provided that such loss or liability does not also result from an act or omission of, or failure of performance by Landlord or Landlord's agents, employees or contractors. ***"
(Exhibit 3). Thus, the Lease already provides for HSBC to indemnify MBA if its use of any part of the building causes loss or liability.
MBA's motion is denied. HSBC's motion is granted. HSBC is to submit a proposed form of declaratory judgment to the Court, upon notice to MBA.
ORDER
This constitutes the Decision and Order of the Court.
ENTER: December 9, 2003
HON. JOSEPH G. MAKOWSKI
Justice of the Supreme Court
Decision Date: December 09, 2003
Footnotes

Footnote 1: HSBC contends, and the Court agrees, that to the extent that Mr. Gaglione's affidavit is not shown to be based upon personal knowledge, it is without evidentiary significance on the motions (see Hugelmeier v Town of Sweden, 101 AD2d 995, 996 [4th Dept 1984], affd 63 NY2d 909 [1984]).

Footnote 2: For convenience, both CC&F and MBA will hereafter be referred to as "MBA"; Marine Midland Bank and HSBC shall hereafter be referred to as "HSBC".

Footnote 3:There are no floors numbered 2 through 6 in the Tower.

Footnote 4:Falzone defined a hub a piece of equipment also referred to as a "concentrator" to be a device that can convert a signal, such as from digital to optical (and vice versa), to enable it to run on a fiber optic cable (see Falzone EBT at 26-27, 37-38). Hubs also measure a signal's quality and strength, analyze and amplify it and distribute it and "participate in the movement of the protocol that [is] resident on those circuits" [sic] (40). MBA's expert report defines hubs as "[t]he point on a data network where circuits are connected" (Exhibit 53 Appendix A).

Footnote 5: The draft report of Riser Management Systems, L.P., dated April 26, 2001, entitled "One HSBC Center Telecommunications Infrastructure Engineering Review" states inter alia, in the section concerning future development recommendations: "Due to HSBCs use of the closets on floors 7-28 for its proprietary distribution system, we recommend using the dumbwaiter shaft and the corresponding 6x6 foot mail rooms for an alternative pathway for riser cables to access multi-tenanted upper floors." (Exhibit 58, at 12). The later drafts do not contain this language (see Exhibit 45 [entitled "Expert Report"], and Exhibit 53 [final expert report dated October 18, 2002]). Plimpton apologized if his report was misleading (Plimpton EBT at 74, 77) and claimed that that recommendation held only if the existing pathways were unavailable (Plimpton EBT at 77).